George D. PATTERSON, District Director of Internal Revenue, Appellant,

v.

J. C. THOMAS and Martha Thomas, Appellees.

No. 18263.

United States Court of Appeals Fifth Circuit.

March 16, 1961.

Rehearing Denied April 12, 1961.

John R. Brown, Circuit Judge, dissented.

Norman H. Wolfe, Lee A. Jackson, Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., W. L. Longshore, U. S. Atty., Birmingham, Ala., Howard A. Heffron, Acting Asst. Atty. Gen., I. Henry Kutz, Atty., Dept. of Justice, Washington, D. C., M. L. Tanner, Asst. U. S. Atty., Birmingham, Ala., for appellant.

John W. Gillon, Ira L. Burleson, Ralph B. Tate, Birmingham, Ala., for appellees.

Before RIVES, BROWN and WISDOM, Circuit Judges.

RIVES, Circuit Judge.

The District Director appeals from a determination by the district court [1] that amounts paid by the taxpayer's employer to a hotel and a travel agency for accommodations, meals, and a sight-seeing trip for the taxpayer and his wife did not constitute gross income to the taxpayer; or, if they did, then such amounts, together with expenditures for which the taxpayer was reimbursed by his employer, were deductible by the taxpayer as ordinary and necessary business expenses.

The taxpayer, J. C. Thomas, was employed during the relevant period as a field representative of the Liberty National Life Insurance Company. By meeting certain standards, the taxpayer qualified to attend and bring his wife to the Company's annual Torch Club convention,[2] which in 1956 was held at the Hotel Chamberlin, Old Point Comfort, Fort Monroe, Virginia.

To attend this meeting, the taxpayer and his wife departed from Birmingham on May 14, 1956, spent two nights en route at a place of public lodging, and arrived at the Hotel Chamberlin on May 16. Their return trip commenced on May 20. They spent one night at a public lodging en route to Birmingham, and reached home on May 21. The taxpayer and his wife traveled in their own automobile. Prior to his departure from Birmingham, the taxpayer received from his employer a check for $168.16, which was spent for transportation, meals and lodging to and from the Hotel Chamberlin.

The Company paid directly to the Hotel Chamberlin $103.40 for lodging and meals for the taxpayer and his wife at the hotel while attending the meeting. The Company also paid directly to a travel agency the sum of $12.92, representing the expenses of a sight-seeing trip to Williamsburg, Virginia, for the taxpayer and his wife. The aggregate expenses totaled $284.48. There is no question in this case as to the reasonableness of the amount of these expenses.

The Torch Club originated in 1931 and was composed each year of outstanding field representatives of the Company who had during the preceding year met certain established goals. The Company "required" those employees who were invited, and their wives, to attend the annual meeting of the Torch Club. Employees who qualified for the convention, but who failed to attend for any reason, did not receive any money or other thing of value from the Company in lieu of such attendance.

Those present at the Torch Club convention were expected to adhere to the scheduled program. The taxpayer and his wife participated in substantially all of the scheduled activities.[3] The tax-

---

1. 189 F.Supp. 230.

2. The requirements for membership in the Torch Club are "based upon sales of new business and the conservation of old business."

3. Taxpayer and his wife did not go to the motion picture scheduled for the evening of Thursday, May 17, as they had previously seen it. Nor did they stay "the whole time" at the water show held on Wednesday evening.

payer had no control over the program, the time, or the place of the meeting.

The schedule of activities at the Torch Club convention was as follows:

Wednesday, May 16:
    1:30   Arrival
    1:30–5:00  "Renewing old acquaintances and making new acquaintances."
    6:30   Company dinner and water show.

Thursday, May 17:
    7:00–9:30  Breakfast with delegates
    10:00   Meeting (2½ hours)
    Afternoon—No planned activity (Taxpayer played golf)
    8:30   Movie

Friday, May 18:
    7:00–8:30  Breakfast with delegates
    9:00   Tour of Williamsburg and Jamestown
    8:30   Bingo

Saturday, May 19:
    7:00–9:30  Breakfast with delegates
    10:00   Meeting (2½ hours)
    Afternoon Boat Trip
    7:00   President's Banquet and Ball.

———◆———

The appellants' position is that this trip to the Hotel Chamberlin constituted the prize in what, in substance, was an annual sales contest.[4] The taxpayer seeks escape from this determination along two routes.

Initially, the taxpayer argues that his employer's payments to him and to the Hotel and travel agency for his benefit did not constitute gross income to him. For purposes of determining whether these sums were income, we may treat the amounts paid directly to the Hotel and travel agency and the traveling expenses for which the taxpayer was reimbursed in the same manner. In both situations the taxpayer ultimately received only non-cash goods or services, paid for by his employer. Taxpayer claims these sums come within the rule of Corliss v. Bowers, 1930, 281 U.S. 376, 50 S.Ct. 336, 74 L.Ed. 916, and are not income to him since he had no "command" over them and was not free to expend them in any manner he saw fit. It has been established beyond question, however, that receipt by a taxpayer of benefits in a form other than cash may constitute income to him.[5] Appellee next argues that the $168.16 advanced to him for traveling expenses and the sums paid directly to the Hotel and travel agency

4. In his welcoming speech, the President of Liberty National noted that the Company "officially abandoned all company-wide contests a few years ago." He went on to add that, "The only company-wide contest we have left, if it can be called a contest, is the Torch Club, and I do not classify that as a contest, for no one is forced to make it and no one is criticized if he fails to do so."

    Gross income includes amounts received as prizes and awards. Section 74, Internal Revenue Code of 1954, 26 U.S.C.A. § 74.

5. See Section 61, Internal Revenue Code of 1954, 26 U.S.C.A. § 61; Treasury Regulations §§ 1.61 2(d) (1), 2(d) (3). See also Commissioner of Internal Revenue v. Glenshaw Glass Co., 1955, 348 U.S. 426, 432, 75 S.Ct. 473, 99 L.Ed. 483; Commissioner of Internal Revenue v. Lo Bue, 1956, 351 U.S. 243, 246, 76 S.Ct. 800, 100 L.Ed. 1142.

did not constitute gross income to him because they were expended for the "convenience of his employer." Taxpayer cites, in support of this theory, Regulation 111, Section 20.22(a) (3) of the 1939 Code, which reads, in part, as follows:

"If * * * living quarters or meals are furnished to employees for the convenience of the employer, the value thereof need not be added to the compensation otherwise received."

It is clear from the words of the regulation itself and the cases relied on by appellee [6] that the "convenience of the employer" rule there referred to applies only to meals and lodging and does not exclude amounts paid to the taxpayer which he expended for gasoline, sightseeing trips, etc. from the Code's broad definition of income. The fatal blow to taxpayer's position, however, is delivered by Section 119 of the 1954 Code, 26 U.S.C.A. § 119, which enacts the "convenience of the employer" rule into law, but in a modified form. Under that Section, meals and lodging furnished by employers to employees are excluded from the gross income of the employees "only if

"(1) in the case of meals, the meals are furnished on the business premises of the employer, or

"(2) in the case of lodging, the employee is required to accept such lodging on the business premises of his employer as a condition of his employment."

This Section is inapplicable to the sums in issue which were spent for meals and lodging en route to and at the Hotel Chamberlin.

Since the payments received by the taxpayer and his wife from his employer and the noncash goods and services received by the taxpayer and his wife as a result of payments by his employer were includible in the taxpayer's gross income, we must decide whether these amounts were deductible by the taxpayer as ordinary and necessary business expenses within the meaning of Section 162 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 162.

Treasury Regulations 1.162–2 (I.R.C. 1954) provide in part:

"(b) (1) If a taxpayer travels to a destination and while at such destination engages in both business and personal activities, traveling expenses to and from such destination are deductible only if the trip is related to the taxpayer's trade or business. If the trip is primarily personal in nature, the traveling expenses to and from the destination are not deductible even though the taxpayer engages in business activities while at such destination. However, expenses while at the destination which are properly allocable to the taxpayer's trade or business are deductible even though the traveling expenses to and from the destination are not deductible."

Both parties agree that the crucial determination is whether the primary purpose of the trip was business or pleasure.

■■ At the outset, it is important to note that the nature of the trip must be determined from the individual taxpayer's point of view, rather than from the viewpoint of his employer. To illustrate, an employer may find that the efficiency of his salesmen is greatly increased if he gives them a two-week, all-expense-paid vacation trip to Florida as a reward for increasing sales. From the employer's point of view, the amounts he expends in providing the trip may be business expenses deductible by him.[7] But to the recipient, that trip is solely for pleasure. Although "connected with" his business, the salesman who goes on the Florida jaunt is receiving income, just as if the prize in the sales contest

---

6. E. g., Diamond v. Sturr, 2 Cir., 1955, 221 F.2d 264, 267 (reviewing history of the "convenience of the employer" rule); Boykin v. Commissioner, 8 Cir., 1958, 260 F.2d 249.

7. Expenses of this type would apparently not be deductible by a life insurance company. Section 803, I.R.C. of 1954, 26 U.S.C.A. § 803.

were a bonus, and the amounts expended in going to Florida and spending the two weeks there would be nondeductible personal expenditures. We note, therefore, that the deductibility of sums as business expenses by an employer is immaterial in determining whether the expenditure of those sums by their recipient is deductible by him as an ordinary or necessary business expense.

In determining whether the taxpayer's trip here under consideration was primarily for business or primarily for pleasure, we consider the following:

1. *"The amount of time during the period of the trip which is spent on personal activity compared to the amount of time spent on activities directly relating to the taxpayer's trade or business * * *."* [8] The schedule of activities at Old Point Comfort reveals that, at the most, five hours out of the three and one-half days were spent in formal business meetings. The first of the two meetings consisted mainly of welcoming speeches, and a review by the President of the past year's activity of the Company, the latter being subsequently reprinted for general distribution. At the second meeting, two speakers did talk on subjects of an educational nature. But more time was spent on the sight-seeing tour alone than at both of these "business" meetings. In answer to this point, the taxpayer forcefully argues that, although the schedule reveals much activity of a purely recreational nature, he sought as co-participants in those activities company officials and better salesmen than himself, who might, while "playing," provide him with information on improving his abilities. He testified that much of the conversation on the sight-seeing tour, the boat trip, and his golf game directly concerned

his business. Were these the only facts on which the court had to base its judgment, the proper resolution of the issues in this case would be more difficult than we believe they are. We do think, however, that the low proportion of time spent in formal business meetings distinguishes cases such as Coughlin v. Commissioner, 2 Cir., 1953, 203 F.2d 307, where the taxpayer, an attorney, was allowed to deduct the expenses of tuition, travel, board and lodging incurred in attending a federal tax institute at New York University.

2. *The convention was sponsored by the taxpayer's employer and its only participants were taxpayer's co-employees.* Taxpayer seeks to rely on cases such as Alexander Silverman, 1927, 6 B.T.A. 1328, which allowed a university professor to deduct the expenses of attending a scientific convention. In none of those cases, however, was the convention sponsored solely by the taxpayer's employer. This fact, we think, is some, though not conclusive, evidence that the convention was really a form of remuneration.

3. *The convention was held at a resort hotel.* The taxpayer argues that the number of people attending the convention was large, and that a location had to be found where all the conventioneers could be housed together. Although the evidence is by no means conclusive on the point, it may well be that no hotel located closer to the homes of the convention participants was capable of handling a group of that size.[9] But, the fact remains, the convention was at a resort hotel.[10]

4. *The attitude of the Company.* The Company looked on the trip as one primarily devoted to pleasure and sought to

---

8. Treasury Regulations 1.162–2(b) (2).

9. But see, Rudolph v. United States, D.C. N.D.Tex.1960, 189 F.Supp. 2.

In his welcoming speech, the President of Liberty National noted that: "This is an unusual meeting since it is being held here in Virginia, a state in which we do not operate * * * but it was felt that everyone would enjoy a trip to this historic part of the country."

10. Among the facilities available to the conventioneers were: Shuffleboard; horseshoes; ping-pong; billiards; pool; a heated, outdoor, salt water swimming pool; a picnic area; and a television theater. In addition, the hotel was situated in "the center of historic Virginia" with numerous spots for sight-seeing enthusiasts.

convey this impression to the participants. In making arrangements for the trip, a vice-president of the Company wrote to the Manager of the Hotel Chamberlin, that: "While we hold two business meetings during our four-day convention, business is secondary. The main object is to give our people a good time. Specifically, I would be interested in knowing the fishing accommodations." The next paragraph of that letter reads:

"One thing that interests us about Old Point Comfort is the proximity to Williamsburg and other famous historical places. I would like to get some information relative to sight-seeing trips for the entire group. Another question I would like to clear up is relative to the weather during the month of May. Is it warm enough for outdoor activities or not?"

The vice-president's wife sent a letter to the wives of qualifying employees, in which she noted that:

"The Virginia Peninsula has everything to offer for a vacation convention. It is the sight-seer's paradise. One whole day of the Convention will be devoted to a tour of Jamestown and Williamsburg, with a stop at the battlefield at Yorktown, where the surrender of Cornwallis to George Washington ended the Revolutionary War. There is so much to be seen!"

The letter concluded: "I hope you will have as much fun as we have had in planning this vacation for you." With reference to the employees, there was testimony that, "they consider it a reward. I hope they do. We have been trying to sell them on it for a long time."

■■■ We think that the foregoing factors establish that the primary purpose of the trip to the Hotel Chamberlin was pleasure.

Whether an expenditure is ordinary and necessary to a taxpayer's trade or business is usually a question of fact.[11] And "Where the trial has been by a judge without a jury, the judge's findings must stand unless 'clearly erroneous.' Fed. Rules Civ.Proc. 52(a), 28 U.S.C.A. 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' United States v. United States Gypsum Co., (1948), 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746." [12]

We are convinced that the findings of the trial court, to the effect that the payments in this case were not properly includible within the taxpayer's gross income, and that if so includible, they were deductible as ordinary and necessary business expenditures, are mistaken and thus clearly erroneous within the meaning of Rule 52(a), F.R.Civ.P.

The taxpayer will be allowed a pro rata deduction for the amount of time spent at the business meetings, but no deduction will be allowed for his travel expenses.[13]

It follows, as a matter of course, that deductions claimed by the taxpayer's wife will be denied *in toto*, since her presence at the business meetings which taxpayer attended had no bona fide business purpose from the viewpoint of the taxpayer.[14]

The judgment of the district court is reversed and the cause remanded for further proceedings consistent with this opinion.

Reversed and remanded.

JOHN R. BROWN, Circuit Judge (dissenting).

I certainly concur that the amounts involved constituted income to the Taxpayers. The question is whether the

11. Commissioner of Internal Revenue v. Heininger, 1943, 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171.

12. Commissioner of Internal Revenue v. Duberstein, 1960, 363 U.S. 278, 291, 80 S.Ct. 1190, 1200, 4 L.Ed.2d 1218.

13. Treasury Regulations 1.162–2(b) (1), quoted supra.

14. Treasury Regulations 1.162–2(c).

amounts spent were "ordinary and necessary expenses paid * * * in carrying on any trade or business," § 162(a), or ordinary and necessary "traveling expenses * * * while away from home in the pursuit of a trade or business," § 162(a) (2).[15]

I am also in agreement that we are here concerned with Mr. and Mrs. Thomas as the Taxpayers. We must therefore view it from their standpoint. Deductibility to either of them is distinct from the deductibility to "their" employer, Liberty National Life Insurance Company. I would not, however, go so far, as does the Court, to say that the deductibility status to the employer-corporation of the payments made by it " * * * is immaterial in determining whether the expenditure of these sums by their recipient is deductible by him * * *." For reasons which I undertake to develop the considerations making expenditures "ordinary and necessary" to the employer may be part and parcel of a business situation making the spending of such sums equally ordinary and necessary as to the recipient employee. In other words, the one is a factor influencing the other.

But I differ fundamentally as to the denial of full deduction to the husband for all of his expenses. The position of Mrs. Thomas is not so clear, but as to her also I think the expenses were deductible without proration.

I say fundamentally because deductibility depends on the statute, and not on what this or that particular court decision happened to hold. Consequently, I would not urge that our decision here is contrary to the cases pressed by Taxpayers.[16] These are but two isolated opinions in what has been described by one Court as a "formidable array of authorities."[17] A leading text more accurately calls it "a plethora of authorities"[18] especially in view of the aptness of the medical connotation that this is "a morbid condition characterized by an excess of blood in the body" of the law.

A constant recurrence to the words of the statute "ordinary and necessary" in the light of general principles distilled from this mass of material will, in my judgment, put quite a different turn on the activities of these Taxpayers. A brief resume shows, I think, two things: First, the Court disregards these factors; and second, it operates as a fact-finder to reach factual inferences contrary to those of the District Judge who saw and heard all of these witnesses.

To begin with the standard of "ordinary and necessary" concerns whom? The test is not what the Commissioner thinks ought to be necessary or ordinary, or what a court, or its judges, might consider proper. Fortunately for our economy, none of these has the responsibility for running the particular business—personal or corporate—whose income is so essential as a subject of taxation. The test is in terms of the specific taxpayer. It seeks to measure whether, as to him, the questioned expenditures are substantially related to his business venture whose object is making money.

We encounter no difficulty in this record in relating Taxpayer's usual activity to a "trade or business." As to this element Taxpayer's employment fits the simple test that "Every person who works for compensation is engaged in the business of earning his pay * * *."[19]

---

15. 26 U.S.C.A. § 162(a). "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business including
   "(1) * * * * *
   "(2) traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; * * *."

16. Coughlin v. Commissioner, 2 Cir., 1953, 203 F.2d 307; Alexander Silverman, 1927, 6 B.T.A. 1328, discussed by the Court, 289 F.2d 113.

17. A. Giurlani & Brother v. Commissioner, 9 Cir., 1941, 119 F.2d 852, 855.

18. 4 Merten's, Law of Federal Income Taxation § 25.01 at 5. Under 136 subheadings covering 390 pages of text, thousands of cases are listed in hundreds of footnotes.

19. Id. § 25.08 at 20.

And it is without dispute that as a field representative of this insurance company he had long conducted "the enterprise in good faith with an intention of making a profit * * *" and "of producing income"[20] for himself. Whether the expenditures in question are deductible turns on whether they were "ordinary and necessary." As to these statutory words "it has been said that" these "mean those expenses which economically are an integral part of a business * * *."[21] An expenditure "will ordinarily be considered 'necessary' if the expenditure is appropriate and helpful in developing and maintaining the taxpayer's business * * *."[22] Quite obviously, "the necessity involved is not absolute or inexorable."[23] Proceeding on the assumption that "a taxpayer will not incur an expenditure unless required or justified by the needs of the business," the "courts are slow to override the taxpayer's judgment as to the necessity for incurring the expenditure."[24]

This brings us to the companion term "ordinary" since the expenditure must be both necessary and ordinary. As we are dealing with an "ordinary" expense in the business community "Customs and practices * * * and forms of speech prevailing in the business world of the taxpayer will usually furnish reliable guides * * *."[25] One thing is clear, the "concept of 'ordinary' * * * does not require that the expenditures be either habitual or normal in the sense that the taxpayer either makes or is required to make them often; the expenditure may be 'ordinary' even though

unique or nonrecurring to the taxpayer affected."[26] Quite obviously, "the nature and scope of the taxpayer's business constitutes a factor of considerable importance."[27] For it "to be 'ordinary and necessary', the expenditure must have some reasonably proximate relation to the customary conduct of the taxpayer's business."[28] After pointing out that the decisive distinctions are those of degree and not of kind for which there is no "verbal formula that will supply a ready touchstone" the Supreme Court has made a remarkable pronouncement. It is remarkable because it takes into account in vivid fashion that the statutory term "ordinary and necessary" is to be judged against the habits and customs of American businessmen whether those on the sidelines would consider them prudent or imprudent, wise or unwise. The Court states the statutory standard:

"* * * is not a rule of law: it is rather a way of life. Life in all its fullness must supply the answer to the riddle."[29]

An eminent text sums it up this way.

"All of the foregoing criteria and principles may be said to rest, at least in part, on an underlying implication. That implication is that whether an expenditure is both 'ordinary and necessary' will depend upon a determination as to whether a hard-headed businessman would have incurred it under like circumstances. That person is the so-called average hard-headed businessman and not necessarily the taxpayer himself. * * *"[30]

20. Id. § 25.08 at 21.

21. Id. § 25.09 at 24, citing Commissioner of Internal Revenue v. Doyle, 7 Cir., 1956, 231 F.2d 635, 637, that "integrality is the test."

22. 4 Merten's § 25.09 at 24.

23. Id. § 25.09 at 24–25.

24. Id. § 25.09 at 25.

25. Id. § 25.09 at 26.

26. Id. § 25.09 at 27 and note 76.2: "An expense may be ordinary though it happen but once in the taxpayer's lifetime. Deputy v. duPont, 308 U.S. 488, 84 L. Ed. 416, 60 S.Ct. 363 (1940); Campbell v. Fields, 229 F.2d 197 (C.A.5th, 1956)."

27. 4 Merten's, § 25.09 at 29.

28. Id. § 29.09 at 31.

29. Welch v. Helvering, 1933, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212, 213; id. § 25.09 at 28.

30. 4 Merten's, § 25.09 at 34. This Court has approved this approach. Rittenberg v. United States, 5 Cir., 1959, 267 F. 2d 605, 608.

How do the facts of these expenditures [31] and Mr. Thomas' business life match these principles? At the beginning is the bald fact that he had nothing to do with picking out Old Point Comfort, Fort Monroe, Virginia. One on a personal jaunt which is to be treated as a vacation normally has something to do with the selection of the place and the time. More than that, whether to go or not to go was not a matter of choice with him. He was not a free agent—unless, to play on words, he declined to go in which case he would indeed be a free agent—free of a job and free of Liberty National.

This convention had some of the earmarks of a prize. But it was more than that. It was a command appearance. Its importance is not for us to judge. That judgment was made by the employer, Liberty National. Those "invited" to the Torch Club were outstanding field representatives who had during the preceding year attained certain standards, evidenced high abilities, and made outstanding contributions to the Company. How much real freedom did one invited have to decline the bid? None at all, were he interested in his future employment or advancement.

The president of Liberty National so testified without contradiction:

"Q. Does the company require those who qualify and are extended an invitation to attend these [Torch Club] conventions?

"A. Well, we don't issue an order but in effect it is a requirement. They know good and well enough if they do not attend their chances of promotion is just nil.

"Q. Does the company expect the wives of the agents to attend?

"A. Yes sir."

How may this Court disregard the positive testimony that employees were required to attend? Certainly we may not do it on any inherent credibility flaws of the witness or his words. The District Judge credited this testimony and expressly found that Liberty National required these people to attend.[32] Do we mean to imply that while the president so stated, he really didn't mean it, or that there is no "proof" that the Company would have been so harsh to one who had the temerity to decline the King's command?[33] And if we presume to do so, from whence cometh our help or competence?

In the isolation of our judicial tower we are blind indeed to all that goes on in the busy dynamic world of commerce if we do not know—either generally or from what this record teaches—about the contemporary American institution of the "organization man."[34] He is more than a fictional character. He is a modern phenomenon. One weds a wife but he marries a corporation too. Every waking hour the company's needs, the company's business, the company's welfare is drummed into this person whose

31. The amounts paid directly by the employer and those reimbursed to Thomas by the Company's advance are all attributed as income. Consequently, the questions in issue are the same as though the amounts were paid out of his pocket with no right of reimbursement.

32. The Court formally found: "6. The Company requires those employees, agents, supervisors, superintendents, home office officials who are invited and their spouses to attend the annual meetings of the Torch Club. This requirement is not a condition of continued employment, but failure to attend without

adequate reason is frowned upon and adversely affects his future promotion."

33. Cf. Ball v. Victor Adding Machine Co., 5 Cir., 1956, 236 F.2d 170, 179 (dissent); Matthew 22:1-14.

34. Nothing said is intended as a disparagement of Liberty National. Testimony of its high ranking officers shows that it is abreast with modern management practices, personnel relations, business psychology and the like. Likewise the Torch Club conventions were kept on a high plane. Unlike some others, this Company has not succumbed to the other American institution—the cocktail party—and no alcoholic beverages were served at any of its functions.

inner satisfactions are likewise finally warped into the corporate image through status symbols of job assignments, titles and prerogatives.

Is one enmeshed in this complex required to risk the decisive displeasure of his superiors by the affront of declining the great honor? Is he not to be judged by the atmosphere in which he exists? With economic consequences so awesome, is it not the risk itself—the very uncertainty of the consequences—which makes his "acceptance" of corporate hospitality a matter of sheer business necessity?

This Court would not hesitate to allow deduction in full if an employee were given a peremptory written order to attend under pain of dismissal or some other form of corporate banishment. That the compulsive pressures, or the genuine apprehension of them, are more sublety exerted does not alter things. In either case the employee responds to the hospitality of the employer because this is essential to economic security and specifically to the retention of progressive employment.

The politicians, the moralists, the psychologists, the sociologists, the psychiatrists may all deplore what has come to pass, but this is, as the Supreme Court said, "a way of life," and it is that "life in all its fullness"—with all of its absurdities and social evils—that "must supply the answer to the riddle."

For to Mr. Thomas there really never was any riddle. He was faced with no conundrum. Once he was tapped he knew he had to go. His future was uncertain, his promotion frustrated, were he to exercise a choice. As with everything else at Liberty National, Old Point Comfort, the Hotel Chamberlin with its shuffleboard, horseshoes, Ping-pong, billiards, pool and picnic area were now to be the thing he wanted most. Once there, undoubtedly one would have fun. But the decision to go was compelled. It was compelled as a matter of business necessity. It is a pressure which people every day, everywhere in America now under-go. It is ordinary in all and the worst senses.

As American as Bedloe's Island, hot dogs, Grand Canyon, Rhapsody in Blue, Chatauqua, P.T.A., Golden Gate, Rose Bowl or Wagon Train is this institution of the organization man. Mr. Thomas, a victim and a beneficiary of that system, was under overpowering business compulsion to attend. To him the ancient question "to be or not to be" was resolved by the further one "to go or not to go." His productive future depended on the answer. As a good businessman with his ear to the ground, he did not have to wait until hearing the president testify in court that the "chances of promotion is just nil" to know what the answer would have to be.

Congress used two simple terms, "ordinary" and "necessary." They more than comprehend this situation.

The extent to which Mrs. Thomas, the wife, was absorbed into this corporate image serves a dual purpose. First, it shows why her attendance had a financial business purpose distinct from a holiday. Second, it is additional proof of the extent to which the daily life of the husband, the nominal employee, was smothered by the predominate concern of what is best for the Company.

In this respect the Company was following another good American pattern that, to paraphrase an old hymn, "this is a woman's world." Women run the home. Women are the teachers, secular and religious. They are den mothers, pack mothers, tribe mothers and home room mothers. Women are the effective civic reformers. A male aspiring for high public office runs on or with his wife. And in the view of Liberty National the success of the husband-employee depends on the wife.

As with another woman this also begins at the beginning. Before an agent is hired, the District Manager must interview the applicant's wife in her home. Already the seeds of complete, unlimited, untiring, unshared loyalty are being

planted.[35] She is given a booklet especially prepared for wives of prospective employees. The husband, if hired, is employed on a temporary basis for a trial period. At that time the wife receives a welcoming letter which transmits the President's message entitled "A Family Affair" which leaves little doubt that mother is in this too. After the husband passes his period of probation, the husband and wife each receive letters of notification that employment has become permanent. Again, nothing is casual or accidental. This letter transmits another booklet especially prepared for wives called "The Feminine Touch."[36]

But this Company does not risk another Paradise Lost so the barrage continues. The "Torch Magazine" each month, and District Manager Bulletins each week are mailed directly into the home and "in some instances the district managers mail them direct to the wives." It is no mere euphemism to regard the wife as "a partner to him in this business we are in." For in addition to this running pressure a special visit by managerial representatives is made each year in the home. In joint consultation with husband and wife the family's needs are reviewed with the Company representative and translated against required production through the use of Company prepared planning and budget forms.[37] What is wanted, what is needed, what may be had, finds common, single expression in the Company's welfare. As genuine as the employer's interest is, this is not regarded as corporate philanthropy. In the Company's eyes the key to the husband's success is the wife.[38]

All of this has a substantial bearing on tax deductibility. It, of course, affords ample basis for the Company to deduct its expenditures in wife cultivation. This does not automatically extend like treatment to the wife as recipient. But when the program is so well organized, the corporate wife propaganda so intense and continuous, is it not reasonable that

35. The Agency Vice President testified:
"Q. If you decide to employ a man do you talk to his wife?
"A. We require that * * * our District Manager go into the home and interview the wife of every prospective agent before he is actually employed by the company. This is done to determine whether or not the man's wife would be sympathic and helpful to him in the business he is going to be in and also for him to explain to the wife the fact this is a business that has irregular hours."

36. The Agency Vice President described it:
"A. That booklet * * * we send to the wife at the time her husband becomes a permanent employee. The title of this book is 'The Feminine Touch' and it tells a wife in detail some of the things she can do and how she can assist her husband in becoming a successful life insurance man."

37. The Agency Vice President stated:
"A. * * * We believe a man's wife is a partner to him in this business we are in. We definitely feel when we hire a man we hire his wife along with him. A particular example of that is once each year when we put out our program of progress, which is the basic compensation plan for the insurance year, the plans and so on of the company for the next year, we put out some planning forms and budget forms and our managerial people go into each agent's home and with this agent and his wife they make out their budget for the next year. And this form is so made that they convert his monetary needs into production that he must produce the next year. And then of course the wife and he together keep the records on how they are progressing during the year. So we take the wife very closely into our business."

38. The Agency Vice President stated:
"A man's wife who is not sympathic with him in his business can have a tremendous influence on him. He would come home late and she would say why aren't you here on time, and he would say I am trying to make a living for you, an unappreciation of course that affects his morale.
Earlier he stated that less than 1% of unmarried men were hired. They rely on married men because "We find that this is a business * * * that requires an awful lot of a man. He lives in a unique type of atmosphere and he needs some ballast for his morale and it is our contention that a wife can assist tremendously and help him to keep his morale high and keep him moving and thinking positively about this business."

husband and wife conclude it to be imperative that when the employer beckons, the wife must respond?[39]

In assaying this we need not consider it in terms of expenditures by the wife as such. Since the husband-employee's economic future is tied into the Company through the wife, and the Company expects the wife to attend, the cost of her travel and keep is an ordinary and necessary expenditure by the husband in his own right and not merely as a vicarious agent for her.

Thus far what I have written sounds perhaps as though I think that the compulsory attendance of husband and wife was merely to satisfy the corporate ego. On the contrary, I think the evidence is overwhelming—and the Trial Court so found—that these hard-headed businessmen considered that money was best spent by sandwiching in the ceaseless company pitch with the attractions found in a delightful resort area. In other words, it is certainly not for Judges situated where we are to say that no serious business advantage was obtained by Mr. Thomas. Until the Commissioner

has to bear the financial responsibility for poor management decision, how is he to say that the participants will not obtain substantial help from this 3-day enforced togetherness as a captive group? Congress did not leave it to tax collectors or judges. The congressional test is in terms of the businessman's needs and practices. The ordinarily prudent or the ordinarily hard-headed businessman with a good deal of psychology on his side may well conclude that the "company message" can best be instilled by minimizing formal business sessions and expanding the so-called "free time" for each to receive new transfusions from others whose doubts, if they exist, will hardly be expounded in this atmosphere of good will. After all, on two of the days the day ended with the Company line being drilled in at Company dinners or banquets, and each day started bright and early with "breakfast with delegates" where the bill of fare most likely was insurance as it would have been law had the participants been judges or lawyers.[40]

If the Company thought it important, if the Company required the husband (and wife) to be there, if the husband

---

39. It bears repeating that the President testified:

"Q. Does the company expect the wives of the agents to attend [the Torch Club]?

"A. Yes sir."

The District Court categorically found that "The Company requires those * * agents and their spouses to attend the annual meetings of the Torch Club. * * *." See note 32, supra. And to the wife this was not all free fun. She had the added expenses of a baby sitter, a maid and, of course, the fashionable new clothes.

40. The Agency Vice President testified:

"Q. In planning these programs [Torch Club] what factors do you consider?

"A. Well just exactly what we are trying to do with our men, we are trying to motivate them to do a good job * * and to use their potential ability * *. More than that, attendance at this Torch Club gives the fellow an opportunity to know other outstanding men and exchange ideas with those people * * *. Knowledge of course is one of the pur-

poses of the Torch Club. We of course have outstanding speakers to attend the meeting. And we try to give them instructions to go back and do an even better job when they get back home. One of the most valuable parts of the Torch Club convention is the fact that these agents come there and [get] to rub shoulders with other outstanding men in our company who are doing a good job and get the opportunity to exchange ideas * * *. And then the fact that they are there with the Home Office officials and the Directors of the company. * * * I think every man that attends a convention leaves * * * a little bit more sold on the company. I think this might be interesting as far as statistics are concerned. * * * We found that 60% * * * of our total agency organization have attended one of these Torch Club conventions and 83% of all of the men who terminated in our company have never attended one of these meetings. Eighty-three percent who terminated have never been there. So 17 percent is all who have terminated of the Torch Club organization."

knew that he was expected and would suffer by not attending, his presence was important for two reasons. First, he would receive the benefits of this contact and instruction. Second, he would secure his job and economic future.

It is no answer to suggest that allowance of such deductions is open to abuse. There is scarcely anything in the complex tax law that is not. Abuses can be checked and prohibited by a determination of courts, either district or tax court, applying general principles to the facts at hand.

Finally the disallowance of deductibility is contrary to the express regulation covering attendance of conventions.[41] And the Court's remand to allow a prorata deduction for Mr. Thomas' expenses while attending business meetings [42] is contrary to the express provision of § 162(a) (2), see note 15, supra, that traveling expenses includes "the entire amount expended for meals and lodging * * * while away from home * *."

The statute states that "The entire amount expended for meals and lodging" may be deducted. This, as we have recently pointed out in Williams v. Patterson, 5 Cir., 1961, 286 F.2d 333, represents a congressional amendment to liberalize deduction to overcome niggardly rulings of the Revenue Service which attempted to limit deductibility to the *excess* of ex-penditures over those which otherwise would have been incurred. In addition, since the Court finds that Mr. Thomas was engaged in his trade or business while attending these business meetings, the question arises how did he get there? It is positive, and the District Court found, that attendance in business sessions was compulsory.[43] The expense of compulsory attendance was not therefore the Smithfield ham and grits for the Company breakfast. To be there he had first to get there. That meant travel and travel meant cost. The regulations cannot take away that which the statute expressly allows. Since, on this Court's finding, Mr. Thomas was engaged in "the pursuit of [his] trade or business" while attending required business meetings held at a place "away from home," he was most certainly entitled to deduct the entire cost for meals and lodging for each of the days on which such sessions were held. For like reasons the cost of actual travel is within the express terms of the statute.

In principle [44] the Taxpayer proved, as the District Court found, overpowering business compulsion and the deductions ought to have been allowed.

I therefore respectfully dissent.

Rehearing denied; JOHN R. BROWN, J., dissented.

---

41. Regulation § 1.162–2(d). "Expenses paid or incurred by a taxpayer in attending a convention or other meeting may constitute an ordinary and necessary business expense under § 162 depending on the fact and circumstances of each case. No distinction will be made between self-employed persons and employees. The fact that an employee uses vacation or leave time or that his attendance at the convention is voluntary will not necessarily prohibit the allowance of the deduction. The allowance of the deductions for such expenses will depend upon whether there is a sufficient relationship between the taxpayer's trade or business and his attendance at the convention or other meetings so that his is benefiting or advancing the interests of his trade or business by such attendance. If the convention is for political, social, or other purposes unrelated to the taxpayer's trade or business, the expenses are not deductible."

42. The Court states: "The taxpayer will be allowed a prorata deduction for the amount of time spent at the business meetings, but no deduction will be allowed for this travel expenses." Citing in footnote 13 Reg. 1.162–2(b) (1), 289 F.2d at page 114.

43. The Court formally found "attendance of those present upon the scheduled program is required and plaintiffs did so attend."

44. I have not undertaken to consider specifically the item of $12.92 for the sightseeing trip to Williamsburg, Virginia. Perhaps other considerations apply as to it.