**Pierre C. WARWICK and Sarah M. Warwick, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 3829.**

United States District Court
E. D. Virginia,
Richmond Division.

July 29, 1964.

Frank W. Hardy, James E. Covington, Jr., Williams, Mullen & Christian, Richmond, Va., Wallace L. Chandler, Jr., Asst. Secretary Universal Leaf Tobacco Co., Inc., Richmond, Va., for plaintiff.

Samuel W. Phillips, Asst. U. S. Atty., Richmond, Va., W. J. Tribbey, A. C. Murphy, Attys., for Department of Justice, Washington, D. C., for defendant.

BUTZNER, District Judge.

Pursuant to the rules, the Court states its findings of fact and conclusions of law.

This is a civil tax refund suit brought by the plaintiffs, Pierre C. Warwick and Sarah M. Warwick, who are husband and wife, for the recovery of additional income taxes assessed and collected from them for the years 1958 and 1959. Mr. Warwick is employed by Universal Leaf Tobacco Company, Inc.

The case concerns the tax treatment of expenses Mrs. Warwick incurred upon trips abroad.

More specifically, the issues are whether Mr. and Mrs. Warwick properly deducted in 1958 Mrs. Warwick's travel

expenses of $1,584.05, and are therefore entitled to a refund of $1,216.29, plus interest, from April 15, 1963. And secondly, whether Mr. and Mrs. Warwick properly excluded from their 1959 income Mrs. Warwick's travel expenses of $2,003.82, and are therefore entitled to a refund of $1,480.14, plus interest, from April 15, 1963.

Concededly, the amount received in 1959 should have been included in income. That, however, does not determine the case. The parties are in agreement, and the Court believes they have analyzed the case correctly, in stating that the real issue in the case is whether the travel expenses of Mrs. Warwick are deductible.

The Court finds the facts stated in the stipulation of facts and directs the court reporter to incorporate paragraphs 4 and 5.

4. Mr. and Mrs. Warwick timely filed a 1958 joint federal income tax return reporting thereon an adjusted gross income of $65,570.74, composed in major part of $55,402.95 representing compensation received by Mr. Warwick from Universal, and showing a tax due thereon of $22,746.02, which was timely paid. In the return, they claimed a deduction from gross income of $1,584.04 representing Mrs. Warwick's unreimbursed travel expenditures.

The following schedule shows Mr. and Mrs. Warwick's 1958 itinerary and Mrs. Warwick's expenses incurred and paid. This trip took 28 days beginning March 7, 1958 and ending April 1, 1958.

New York – 2 days

| | |
|---|---|
| Hotel | $ 12.15 |
| Meals & Tips | 15.30 |
| | 27.45 |

Lisbon – 7 days

| | |
|---|---|
| Hotel | 66.20 |
| Meals & Tips | 62.00 |
| | 128.20 |

Madrid – 6 days

| | |
|---|---|
| Hotel | 40.00 |
| Meals & Tips | 53.50 |
| | 93.50 |

San Sebastian – 2 days

| | |
|---|---|
| RR fare Madrid San Sebastian–Madrid | 33.20 |
| Hotel | 6.80 |
| Meals & Tips | 21.50 |
| | 61.50 |

Tarragona – 2 days

| | |
|---|---|
| Hotel | 11.00 |
| Meals & Tips | 19.95 |
| RR fare Barcelona – Tarragona Barcelona | 15.35 |
| | 46.30 |

Barcelona – 1 day

| | |
|---|---|
| Hotel | 3.40 |
| Meals & Tips | 10.10 |
| | 13.50 |

London – 7 days

| | |
|---|---|
| Hotel | 67.20 |
| Meals & Tips | 60.20 |
| | 127.40 |

New York – 1 day

| | |
|---|---|
| Meals & Tips | 6.70 |
| Plane Fare | |
| Richmond – N. Y. – Lisbon – Madrid – Barcelona – London – N. Y. – Richmond | 1079.50 |
| Total Expenses: | 1584.05 |

Upon audit, the Commissioner disallowed this claimed deduction and, as a result, assessed a tax deficiency for 1958 of $982.11 which Mr. and Mrs. Warwick paid to the District Director on April 15, 1963, together with assessed interest of $234.18.

5. Mr. and Mrs. Warwick timely filed a 1959 joint Federal income tax return reporting thereon an adjusted gross income of $81,855.63, comprised in major part of $68,188.00 representing compensation received by Mr. Warwick from Universal, and showing a tax due thereon of $30,180.54, which was timely paid. In 1959, Universal reimbursed Mr. Warwick for Mrs. Warwick's travel expenditures paid by him during and in respect of his 1959 annual business trip to Europe in the amount of $2,003.82.

The following schedule shows Mr. and Mrs. Warwick's 1959 itinerary and Mrs. Warwick's expenses incurred and paid.

This trip took 50 days beginning January 10, 1959 and ending February 28, 1959.

| London — 2 days | |
|---|---|
| | $ 29.00 |
| Meals, tips & taxis | 13.40 |
| | 42.40 |

| Hamburg — 4 days | |
|---|---|
| Hotel | 155.00 |
| Cables & Telephone | 45.00 |
| Meals, tips & entertainment | 82.60 |
| | 282.60 |

| Madrid — 16 days | |
|---|---|
| Hotel | 274.40 |
| Meals, tips, taxis & entertainment | 420.00 |
| | 694.40 |

| Lisbon — 7 days | |
|---|---|
| Hotel | 221.20 |
| Cables & telephone | 167.00 |
| Meals, tips & entertainment | 142.30 |
| | 530.50 |

| Stockholm — 4 days | |
|---|---|
| Hotel | 60.00 |
| Meals, tips & entertainment | 90.00 |
| | 150.00 |

| Glasgow — 4 days | |
|---|---|
| Hotel | 15.00 |
| Meals, tips & entertainment | 82.00 |
| | 97.00 |

| London — 7 days | |
|---|---|
| Hotel & entertainment | 334.10 |
| Cables | 5.00 |
| Meals, tips, taxis & entertainment | 230.00 |
| | $569.10 |
| | $2,366.00 |

| Total Expenditures | $2,366.00 |
|---|---|

| ⅓ of total was disallowed by Commissioner | 788.67 |
|---|---|

Airplane fares paid by Universal:

| Richmond to New York and return | 70.29 |
|---|---|
| New York to London, England and return | 858.20 |
| London, England to Hamburg, Germany and return | 83.20 |
| Hamburg to Madrid to Stockholm | 230.46 |
| Total airplane fares | 1215.15 |
| | 1,215.15 |

| Total of Mrs. Warwick's expenses: | $2,003.82 |
|---|---|

The Commissioner of Internal Revenue also treated as income to Mr. and Mrs. Warwick in 1959 the sum of $156.69 which it is conceded is properly included in income. Mr. and Mrs. Warwick did not report such reimbursement and payment totalling $2,160.51 (including the sum of $156.69 heretofore conceded) on their 1959 return. Upon audit, the Commissioner determined that this $2,160.51 constituted income, and, as a result, assessed a deficiency for 1959 of $1,404.33, which was paid to the District Director on April 15, 1963, together with $250.60 assessed interest.

The Court finds the following additional facts:

Mr. Warwick was employed by Universal in an executive sales capacity during 1958 and 1959. He was a vice president and member of the Board of Directors. He started working for the company in 1927. He started travelling about 1935, and he has travelled a great deal each year since that time, with the exception of the war years.

For the years 1958 and 1959 Mr. Warwick's annual salary was $17,500. He received a bonus in 1958 of $39,487.00, and a bonus in 1959 of $50,688.00.

The bonus is determined by the president of the corporation and a bonus committee, which consists of two officials of the corporation who do not participate in the bonus plan. A bonus is determined in part upon the company's earnings and in part upon the individual's contribution. For reasons peculiar to Universal, the individual contribution even of the sales executives is not based on mathematical determination, but rather on an objective assessment of the individual's overall contribution to the company.

Universal is a widely held public corporation whose stock is listed on the New York Stock Exchange.

Mr. and Mrs. Warwick own about 3300 shares, which constitute less than ½0th of 1 per cent of the outstanding stock.

Universal does not manufacture tobacco products. It buys tobacco. It processes and sells it in leaf form to manufacturers, who convert it into consumer products. On occasion it acts as a broker in purchasing tobacco for manufacturing companies. Its operations are world wide. Outside the United States, its principal markets are in England, the countries of Europe, and Australia. It also has markets in South America.

Prior to World War II, there were a number of tobacco manufacturers in each of the European countries, and Universal had many customers. Their purchases from Universal were relatively small individually, because of the number of the companies in Europe who were dividing the business.

After World War II, the European tobacco business changed, and, consequently, Universal had to change its method of doing business.

The European producers of cigarettes found that it was necessary to mechanize and to rely on great volume of production, because their margin of profit on units was low and the expense of the machinery was great. Consequently, the small companies either went out of business or were consolidated or bought by other companies. In the latter part of the 1940's, there were comparatively few tobacco manufacturing companies in each of the countries with which Universal dealt, and these companies had very large requirements for leaf tobacco.

It is probably a fair statement from the evidence to say that in any given country, in place of scores of companies, as was the condition before the war, the number was reduced to five or less.

Also, in certain European countries, tobacco monopolies were established by the government.

Universal found that with this situation, its salesmen couldn't simply go over and take orders. The potentiality of purchases from any single company were tremendous. No specific figures were cited in the evidence, but it was mentioned, and the Court finds, that one company would place orders well in excess of $1,000,000 at one time.

Universal utilized its officers as its salesmen. It did not have any employees as salesmen in its European business. Some eight or nine officers acted not simply as salesmen, but as representatives of the company in Europe. These officers were expected to socialize with certain customers. Over a period of years, they established very close and intimate relationships with the customers any one of whom could, and did, place very large orders.

Universal's gross sales grew from approximately $77,000,000 a year in 1946 and 1947 to approximately $144,000,000 a year in 1958 and 1959. About fifty per cent was foreign business.

The duties of the officers were to become well acquainted with the business of the big companies in Europe. They were expected, and urged, to deal with top management of those companies. They were not required to write orders on the spot, and most of the time they did not do so. Several officers often called on the same customer. For that reason, it was difficult for Universal to determine exactly how much business was produced by any given man from any given company, and it could not use a mathematical formula, as many salesmen are compensated, in determining a bonus.

The officers were expected to find out the interest of these companies, the taste that they sought in tobacco, their problems, their strengths and their weaknesses. The officers used this information not only to promote sales, but also to guide Universal in buying tobacco.

They were encouraged and required to have very close friendly relationship with the European customers. They were expected to entertain those customers when they came to this country.

Their duty was to project a corporate image of Universal that would show that Universal was a competent company of integrity, and that it could and would supply necessary and desirable raw tobacco.

A great deal of business was transacted by telephone. Large orders were placed, received, and acted upon by telephone as a result of the intimate relationship that Universal cultivated, through its officials with its purchasers.

In 1947, the president of Universal experimented with taking his wife abroad for the purpose of assisting him in establishing firm and friendly relationship with his customers. He mentioned this to Mr. Warwick, and although Mr. Warwick was not ordered by the company to do so, he took his wife abroad, starting in 1947.

She has continued to travel with him on his annual business trip to Europe and the Continent from 1947 until the present time, with the exception of two or three years around 1954 when, because of arrangements for the care of her daughter, she could not go. Mr. Warwick took short business trips from time to time without his wife.

Mrs. Warwick is not a trained tobacco saleswoman. She is not specifically trained in any sales work. She is in her late fifties and presents a very personable and attractive appearance.

Her duties were to assist her husband establish the close friendly intimate relationship with the customers that Universal required of her husband. She did not plan the itinerary. She did not sit in on the negotiations of any particular deal, although negotiations were often carried on in her presence. She did not quote prices or describe the market. She did stay very close to her husband while he was conducting his business. She occasionally went to the manufacturing establishments and was taken on tours of the factories. She made the appropriate complimentary remarks about the establishments. She entertained the customers and the wives of the customers in her hotel, and she made it possible and congenial for Mr. Warwick to be entertained in the homes of the customers.

She was invited to come to Europe by customers.

During these trips, Mrs. Warwick did no sightseeing, and she was not a tourist, in the sense that this word is usually used.

She did some minor amount of typing memoranda and personal matters for her husband, arranged for travel reservations when the itinerary was changed, and sent cables when he was otherwise engaged, but only upon his direction.

She had to move from place to place on comparatively short notice, and make a number of changes in the itinerary. She would not always be sure how long they would be gone or where they would be, or how long they would stay. The requirements of business dictated these matters.

The trips were taken during the months of January, February or March. In northern Europe where they travelled, the weather was not good. In southern Europe, it was not ideal vacation weather.

All of Mrs. Warwick's time was devoted to the assistance of her husband on these trips, to the exclusion of vacationing or touring on her own behalf. Neither she nor her husband visited the attractions for tourists.

During one summer Mrs. Warwick did take a tourist's vacation with a friend. The expenses of that trip are not in issue in this case.

On one occasion Mr. and Mrs. Warwick did take a side trip for pleasure while they were awaiting the outcome of negotiations, or awaiting appropriate time to continue negotiations in Spain. That trip, lasting a week, taken with an agent of the company, was not charged as expenses and is not an issue here.

Prior to 1959, Universal did not reimburse Mr. Warwick for his wife's expenditures. In 1959, the president of the company presented to the Board of

Directors of Universal his recommendation that Universal reimburse its officers for their wives' expenditures when they accompanied them on these trips.

Universal established the policy that if a man and wife took a vacation trip while abroad, there would be no reimbursement.

Universal had found through experience that while it was advantageous to have wives accompany their husbands to Anglo Saxon and Latin areas, it was not advantageous to have them accompany their husbands to the Far East, except under unusual and infrequent circumstances. For that reason, Universal did not encourage wives going to the Far East.

Since Mr. Warwick was a senior officer, the decision of whether to take Mrs. Warwick was left to him. Universal instructed junior officers what was expected of them with regard to their wives going on these trips.

Mr. Warwick was unable to demonstrate mathematically what percentage or portion of his earnings resulted from his wife's travelling with him, nor was the president of Universal Leaf able to demonstrate or state what portion of the earnings were attributable to Mrs. Warwick. Both, however, were of the opinion that Mrs. Warwick, through her travels with Mr. Warwick, did contribute measurably to Mr. Warwick's success, and consequently his earnings.

There is no issue about the reasonableness of the expenses. There is no issue in the case about the character of Mr. Warwick's trips.

The trips which Mrs. Warwick took year after year to the same places under the same circumstances to see the same people were not pleasure trips and were not vacation trips.

Before stating its conclusions, the Court will comment briefly on the law. Counsel have been very helpful in ferreting out the cases and presenting them to the Court; but, unfortunately, the cases do not provide a ready means of making a decision. There is no dispute about the law. There is a great deal of variation in the application of the law to the factual situation which exists in the cases. There is no need for the Court to review the various cases. Counsel are familiar with them. The Court is familiar with them. Counsel for both sides have stated that the cases largely turn on factual situations.

Possibly, the leading case is Patterson v. Thomas, 289 F.2d 108 (5th Cir. 1961). That case, like others, can be distinguished on a factual basis. For example, at page 289 F.2d 114, the Court of Appeals states:

"We think that the foregoing factors establish that the primary purpose of the trip to the Hotel Chamberlin was pleasure."

It appears that it was upon this basis that the case was decided. The case is not controlling here, because it is recognized by counsel for the government that Mrs. Warwick was not on a pleasure or vacation trip when these expenses were incurred.

The Court is not unmindful that the finding of the Commissioner is presumed correct, and it is the taxpayer's burden to not only prove that the Commissioner's determination of the tax was wrong, but also to establish the essential facts from which a correct determination of his tax liability can be made.

The Court is treating this case, as counsel treated it in argument, and as it should be treated. It involves a question of deductions, and that places a rather severe burden upon the taxpayer.

There are two sections of the Code which must be kept in mind. Section 162(a) of the 1954 Code provides, in part:

"There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

"(2) traveling expenses (including the entire amount expended for meals and lodging) while away from

home in the pursuit of a trade or business."

Section 262 of the 1954 Code, provides:

"Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses."

The Treasury Regulations on Income tax, 1954 Code, Section 1.162–2 provide in part:

"Only such traveling expenses as are reasonable and necessary in the conduct of the taxpayer's business and directly attributable to it may be deducted."

Subparagraph (c) "Where a taxpayer's wife accompanies him on a business trip, expenses attributable to her travel are not deductible unless it can be adequately shown that the wife's presence on the trip has a bona fide business purpose. The wife's performance of some incidental service does not cause her expenses to qualify as deductible business expenses."

In Revenue Rulings, 55–57, 1955, Cumulative Bulletin 315, it is reported:

"Advice has been requested relative to the deductibility of amounts expended by a taxpayer for the travel expenses of his wife who accompanies him on a business trip or to a business convention."

Thereafter, the text cites certain portions of the Code, and goes on to say:

"Where a wife accompanies her husband on a business trip or to a business convention the Code and Regulations as cited above require a showing that her presence serves a bona fide business purpose, i. e., is not merely for her pleasure or vacation, but is directly attributable to the husband's business and necessary to the conduct thereof."

█ We all know that the word, "necessary," a used in these codes, regulations, bulletins, and cases, does not mean absolutely necessary. It is a relative word. Sometimes it has been defined as appropriate, sometimes as substantially necessary, or qualified in some other way.

█ The Court concludes that the purpose of Mrs. Warwick's trips was not merely for her pleasure or vacation. They were neither pleasure nor vacation trips in any sense of the words.

█ Her husband's trips, of course, were business trips.

The amount expended on her behalf was reasonable.

The only reason she went was because of her husband's business. Her trip was directly attributable to her husband's business, and it was apppropriate to the conduct of his business. It assisted him in his business and assisted in the production of his income.

The Court has reached this conclusion in part from the very unusual position that Mr. Warwick occupies in the business world, and the unusual nature of Universal's business.

Her trips differed from those of a wife who accompanies an ordinary salesman while he calls on the trade, or of a wife who accompanies her husband to Europe on only a single trip.

It follows that the deduction in 1958 was proper.

The parties have stipulated that the issue pertaining to the 1959 taxes is whether Mr. and Mrs. Warwick "properly excluded from their 1959 income Mrs. Warwick's travel expenses of $2,-003.82 and are therefore entitled to a refund of $1,480.14 plus interest from April 15, 1963." The evidence discloses that Universal reimbursed Mr. Warwick for the 1959 expenses. Instead of including this in his gross income and then deducting the amount of the expenses, he simply excluded the amount of the reimbursement and made no deduction.

The Court is of the opinion that the amount of the reimbursement should have been included in gross income and Mrs. Warwick's expenses are properly allowable as a deduction. This may make

some difference in computing the amount of the judgment.

The plaintiffs concede that the amount of $151.69 pertaining to a trip to the Greenbrier Hotel should properly be included in their income. This item, however, is not an issue in the case but must be taken into consideration in computing the judgment.

The Court concludes that Mrs. Warwick's expenses are deductible. Judgment will be entered for the plaintiffs.