**PEOPLES LIFE INSURANCE
COMPANY**

v.

**The UNITED STATES.**

**No. 348–63.**

United States Court of Claims.

March 17, 1967.

Deane E. McCormick, Jr., Washington, D. C., for plaintiff. Robert J. Bird, Washington, D. C., attorney of record.

Ira M. Langer, Silver Spring, Md., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant. Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

Before LARAMORE, Acting Chief Judge, and DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report and opinion filed on January 11, 1966. Exceptions to the commissioner's findings, opinion and recommended conclusion of law were filed by the defendant, briefs were filed by the parties and the case was submitted to the court on oral argument of counsel. Since the court is in agreement with the opinion, findings and recommendation of the commissioner, it hereby adopts the same as the basis for its judgment in this case, as hereinafter set forth. Plaintiff is therefore entitled to recover and judgment is entered for plaintiff in the amount of $6,493.96, plus interest paid thereon, for 1958, and $6,288.76, plus interest paid thereon, for 1959, together with interest on these amounts as provided by law.

## OPINION OF COMMISSIONER *

GAMER, Commissioner:

The question in this case is whether expenditures plaintiff made, principally to hotels and bus companies, for the purpose of holding conventions for certain of its employees (and their wives) in

---

* The opinion, findings of fact and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

fact constituted "wages" to such employees which were subject to income tax withholding by plaintiff.

Plaintiff, an insurance company with its home office in Washington, D. C., sells life, accident, and health insurance. Its sales organization consists primarily of an Agency Department, located in the home office, and 60 District Offices located in the District of Columbia and the seven States in which it is authorized to do business (Delaware, Maryland, North Carolina, Ohio, Pennsylvania, Virginia, and West Virginia), over which the Agency Department has general responsibility. Each district office is headed by a manager and two to four assistant managers. All sales of insurance are made by agents, who work out of the district offices.

Annually plaintiff holds a convention, normally in an eastern city, and provides an all-expense trip thereto from the various district offices to those of its agents who, during the year, succeed in selling a prefixed amount of insurance, as well as to those managers and assistant managers of the district offices who qualify on the basis of the overall performance of the agents on their staffs also meeting a certain standard. Generally, about 18–20 percent of the agents qualify for the convention. In addition certain home office officials and employees attend, also without expense to themselves. The wives of all qualified to attend are also invited, with their expenses too being defrayed by plaintiff. The primary responsibility for planning and conducting the conventions, as well as for fixing the eligibility standards for attendance, is that of the Agency Department.

In 1958, the convention was held in New York City and plaintiff's costs therefor were approximately $36,000, the large part of the expenses constituting payments to the convention hotel and to bus companies for the cost of transporting the employees to and from New York City. There were also en route costs, i. e., en route meals and, where the distance of the district office necessitated overnight accommodations, en route hotel expenses. In 1959, the convention was held in Washington, the bulk of the approximately $35,000 expenses being of the same nature.

Both conventions followed substantially the same pattern. In brief, as to the 1958 New York City convention, most of the buses left the district offices (the majority of which are located in Maryland, Virginia, and West Virginia) on Wednesday morning, August 20, 1958, and arrived in New York City during the afternoon. (A few employees coming from more distant points left Tuesday, staying overnight en route, and also arriving in New York City on Wednesday.) Upon the arrival of a bus at the convention hotel (the Biltmore), the occupants were greeted by home office officials and assigned their rooms.

The first planned event, the "Welcoming Dinner," occurred that evening. The roll of all those attending was called and the leading agents recognized (a process that took around 45 minutes), and speeches were made by plaintiff's president, "Vice President, Agency and Personnel," and "Assistant Vice President, Agency" (who acted as Master of Ceremonies).

The next planned activity was the following morning, when, after a breakfast in a room specially reserved for this purpose (all meals were so arranged to keep the convention group together), an "Agency Meeting" was held. This was in the nature of a work session lasting over 2 hours, with prepared speeches delivered by 10 speakers, i. e., one by plaintiff's Agency and Personnel Vice President, two by the Superintendents of Agents of plaintiff's Western and Eastern Divisions, one by a district manager, two by assistant managers, one by an insurance consultant, and three by wives of agents.[1]

---

1. Their speeches were entitled (a) "Opportunities of an Agent and His Family in the Life Insurance Business," (b) "What Life Insurance Means to Me," and (c) "Ingredients of a Successful Life Insurance Husband."

There then followed a luncheon (at which there were announcements but no formal program) and a free afternoon. However, plaintiff maintained a "Headquarters Room" where home office officials were available during "free time" for discussion and advice. The room was maintained essentially as a business meeting place (with no bar being maintained therein.) Practically all the conventioneers visited this room at least once for discussions with home office officials as well as among themselves.

That evening there followed a dinner, at which there was no formal program (although there were various announcements made), the balance of the evening being free time, and with the next planned activity (again following breakfast) being another "Agency Meeting" on Friday morning of approximately 2 hours at which there were again nine prepared speeches, including two by wives of agents.

There then followed a lunch (with no formal program), a free afternoon (during which conventioneers could take a sightseeing tour arranged and paid for by plaintiff), and the "Agency Leaders Banquet" that evening (preceded by a cocktail party). Seven company officers spoke at the banquet (the president, five vice presidents, and the treasurer), which was then followed by a "Company Dance" (but during which time, the "Headquarters Room" remained open).

There were no planned activities on Saturday, the first bus departures to the home districts (after breakfast and lunch) commencing at around 1:15 p. m.[2]

The annual "Agency Leaders Convention" is considered by plaintiff as an important part of its overall program of sales stimulation, not only as a result of attempts to qualify, but also as a result of the recognition received as a leading agent, assistant manager, or manager. Plaintiff's policy-making officials feel that recognition of achievement is a strong stimulus to motivation and to resulting sales performance. In addition, plaintiff is convinced that the cross fertilization of ideas at the formal programs and the headquarters room, as well as those resulting from 2–3 days of general commingling between the most successful sales personnel from all the districts, can contribute importantly to the overall education of the agent and to his ability to achieve even better sales results. Further, it gives an opportunity to the company's highest officials, at the headquarters room, through their dinner and banquet speeches, and elsewhere during the course of the convention, to indoctrinate the company's top sales personnel with the company's policies and goals, as well as to receive ideas themselves from the company's best field personnel. This kind of "convention" is recommended by the industry's management experts and consultants.

When plaintiff first began holding these conventions in 1948, the wives were not invited to attend. This policy was subsequently changed not only because it was found that a better convention re-

2. At the 1959 Washington, D.C., convention, held at the Statler-Hilton Hotel, the conventioneers similarly arrived on Wednesday, August 19, had a "Welcoming Dinner" that night, two "Agency Meetings" on Thursday and Friday mornings, and an "Agency Leaders Banquet" on Friday night, followed by a "Company Dance." On Thursday afternoon, arrangements were made for all conventioneers to tour the company's new home office. At this convention too the company arranged and paid for one pleasure tour, a Thursday evening boat excursion on the Potomac River. Due to the late completion of the Thursday afternoon home office tour, there was no formal dinner at the hotel Thursday night. Instead each attendant was given $5 at the home office to defray the cost of a dinner at a restaurant of his choice. Also, on Saturday, the buses commenced departing shortly after breakfast.

Of the total of $36,077.51 expended for the 1958 New York City convention, the only amounts paid directly to the conventioneers totaled $2,062.50 as allowances for meals en route. Of the $34,937.58 expended for the 1959 Washington convention, $2,380 was paid directly for the same purpose, plus said $5 per person.

sulted from the wives' presence, but also in furtherance of the company's attempt to integrate the wife into the agent's business life and activities. Plaintiff, as a matter of operating policy, stresses the importance of the wife's contribution to the husband-agent's success. Plaintiff is plagued by a huge annual turnover in its staff of agents. Forty to 50 percent of the agents terminate each year. The work is, at times, discouraging and may, during certain periods, be quite unrewarding financially, despite the necessity of many hours spent away from home in the evenings. Unless a wife understands the realities of the demands made by the insurance business and the agent's problems, approaches the entire situation sympathetically, and can appropriately adjust the home life to the husband's working conditions, an early termination may well result.

Furthermore, plaintiff has found that the wife of an agent such as it employs can contribute in many tangible ways to his success. For instance, she may take over the record-keeping duties.[3] She may, through her own organization activities and the providing of entertainment in the home, obtain prospects. She may even make appointments for her husband with such prospects.

Plaintiff attempts to hire agents who are married, experience indicating that such an agent is normally more successful, and placing as it does such importance upon the wife's role in the overall picture, makes certain that before the agent is hired the home is visited and the wife interviewed. In appraising her, the nature of the insurance business and her husband's future duties and problems are explained. Once hired, training materials directed to the wife are included as part of the new agent's initial training program, and thereafter, the company's monthly magazine, PLICO, is sent to the home so that it may be available to the wife too. As shown, parts of the formal programs at the conventions are specifically directed to the wives. In this respect too plaintiff's decision to have the wives attend the convention comports with the recommendation and advice of life insurance experts and consultants.

Those qualifying for the convention are expected to attend, and those attending are expected to be present at all planned activities. Plaintiff has not had any serious problem in these respects. Explanations for a qualifier's failure to attend are normally transmitted to the home office. In the event of nonattendance, nothing is given in lieu.

Under section 3402 of chapter 24 ("Collection of Income Tax at Source on Wages") of the Internal Revenue Code of 1954 (26 U.S.C. § 3402 (1958)), which was applicable to the tax years herein involved, "[e]very employer making payment of wages shall deduct and withhold upon such wages" (with certain exceptions) a tax based upon a certain formula grounded upon the amount of the wages.[4]

Section 3401 defines "wages," for the "purposes of this chapter," as "all remuneration * * * for services performed by an employee for his employer, including the cash value of all remuneration paid in any medium other than cash; * * *." Section 3403 makes the employer "liable for the payment of the tax required to be deducted and withheld under this chapter * * *."

In 1963, the District Director of Internal Revenue at Baltimore, Maryland (where plaintiff files its returns), took the position that the amounts plaintiff

3. Plaintiff, in addition to being a regular life insurance company, is also a "debit" company, i. e., one that sells insurance on a weekly or monthly premium collection plan. Thus, the agents not only sell insurance, but have collection duties. The collections are made by calling upon the policyholder at his home. These collection duties involve the keeping of certain "debit" records. The "debit book" requires rewriting once a year, a task taking approximately 1 week.

4. The tax is "equal to 18 percent of the amount by which the wages exceed the number of withholding exemptions claimed, multiplied by the amount of one such exemption * * *."

had expended to the hotels, the bus companies, and others, to hold the 1958 and 1959 conventions really constituted additional wages to the attendants upon which plaintiff should have effected withholdings. He contended that "the total actual cost paid by the company for travel, meals and lodgings, and entertainment with respect to the 'conventions'" was "actually, and represented, prizes and awards based on an annual sales contest," and which, therefore, constituted "wages" for withholding tax purposes. Assessments were made on the statutory formula basis (calculating the full $36,000 and $35,000 expenses for the holding of the New York City and Washington conventions, respectively, as the wage base). Plaintiff paid the assessments ($6,493.96 for 1958 and $6,288.76 for 1959, plus interest) and here claims their refund.

In this suit, defendant makes the same basic contention, i. e., that the convention trips amounted to awards or prizes in the form of free pleasure trips or vacations to the winners and their wives, resulting from annual sales contests and, as such, amounted to a form of "remuneration" to the employees under section 3401 with respect to which plaintiff was obligated to effect withholdings. That the remuneration took the form of a free vacation is immaterial, it contends, since the statute specifically provides that "wages" include "the cash value of all remuneration paid in any medium other than cash," and the regulations issued thereunder (26 C.F.R. § 31.3401(a)–1) also provide that "the name by which the remuneration for services is designated," as well as "the basis upon which" and "the medium in which" it is paid are all immaterial "in determining whether the remuneration constitutes wages." It has been held that where an employer holds contests among its salesmen to stimulate sales, with the winners receiving prizes in cash or property, the cash value of the awards constitutes additional wages to the salesmen for Federal employment and withholding tax purposes. Rev. Ruling 55–232, 1955–1 Cum.Bull. 115.

Plaintiff urges, however, that the expenditures made to hold the conventions were not intended to and did not in fact constitute "cash or equivalent" sales contest prizes to its employees. It says that such expenditures were, instead, made in its bona fide judgment as necessary expenses in the conduct of its business as an employer and did not, therefore, constitute remuneration "for services performed by an employee for his employer" within the meaning of the withholding tax statute. The regulations themselves note certain types of expenditures which an employer may make to or on behalf of employees, and which may relate to some activity associated with the employees, but which nevertheless will not be regarded as constituting wages subject to withholding. For instance, section 31.3401(a)–1(b) (2), *"Traveling and other expenses,"* provides that "Amounts paid specifically—either as advances or reimbursements—for traveling or other bona fide ordinary and necessary expenses incurred or reasonably expected to be incurred in the business of the employer are not wages and are not subject to withholding." Plaintiff says the great bulk of the convention expenditures, such as the bus, hotel, and meal expenses, should be considered as falling in such category, and that the balance of the expenditures, such as the expenditures for the sightseeing trip, the cocktail party, and the dance, would fall within subsection 1(b) 10, *"Facilities or privileges,"* which provides that such facilities or privileges as entertainment furnished "by an employer to his employees generally are not considered as wages subject to withholding" if they "are of relatively small value and are offered or furnished by the employer merely as a means of promoting the health, good will, contentment, or efficiency of his employees."

■ Viewed against the background of all the facts, it seems clear that plaintiff is correct and that these convention expenses are not fairly to be considered as "remuneration for services performed by an employee for his employer."

On this record, there would be no justification for rejecting the entirely credible showing plaintiff makes to the effect that the conventions were important ingredients of its total corporate effort to build a stable, knowledgeable, and loyal agency force, upon which its very existence depends. As such, the convention costs were, from plaintiff's point of view as an employer, expenditures incurred to advance its own wholly legitimate and bona fide business purposes, and not, as defendant maintains, only a free trip or vacation prize or award in an annual sales contest, designed simply to give the employees a pleasurable experience without any significant serious work aspects involved. Considering at least the two morning agency meeting work sessions, with their plethora of speeches, the formal program dinners, with the substantial time devoted to talks by the corporate officers and the indoctrination opportunities they presented, as well as the headquarters room activities, all during a relatively short 2½–3-day period at the convention site, the record simply fails to support defendant's contention. Even if one were to play the rather fruitless game of adding up all the "work" session time (considering the dinners with formal programs in that category) and comparing such total with the "free" time or the planned social activities (assuming all of such time was actually used as such by all conventioneers, a conclusion which the record rejects), the work time would be far from insignificant (finding 30). It exceeded the planned social activity time.

Further, all qualifiers were "expected" to attend. In practical effect, they were required to attend. Those who for some reason could not attend received no "prize" money instead representing the value of the trip. When an employer to all intents and purposes directs an employee to be present at a certain place and at a certain time, the conclusion is compelled that the trip, at least from the employer's point of view, primarily serves his purposes.

Certainly, those home office officials who were specifically directed to attend and who, through assigned duties, were tied up during practically the entire convention either with the planned activities or in the headquarters room, or both, were not, in plaintiff's view, being granted a "vacation," even in the broadest sense of the term. They sell no insurance, and therefore do not "qualify" to attend on any sales formula basis. Yet defendant would seemingly make no exception even as to them. It would simply take the entire convention costs, divide them by the number of employees attending, calculate the resulting product as additional "wages" or "remuneration" to each attendant, and then impose upon plaintiff the obligation of withholding a portion thereof in accordance with the statutory formula.

To be sure there are, as defendant points out, strands of "prize" or "award" characteristics present. A sales quota must be achieved to "win" the right to attend. There was free time available which could be used for sightseeing or other pleasurable pursuits, and there were activities of a social nature, such as the dance. And indeed during the tax years involved plaintiff, by articles in its monthly magazine, and by posters and displays in the district offices, urged its agents to increase their sales production and thus "qualify" for the convention, which was sometimes referred to as a "holiday" or "an exciting vacation with all expenses paid." And such slogans as "Let PLICO Pay for You to Play" were sometimes featured.

There were, however, sound business reasons for restricting the convention to the top 20 percent of the agents. (In fixing the annual quotas, plaintiff can foretell quite accurately what percentage of its agency staff will succeed in qualifying.) This top 20 percent accounts for approximately 75 percent of plaintiff's sales. Considering plaintiff's annual agent turnover of 40–50 percent, these are, obviously, the agents around whom plaintiff must hope to build a stable, career, work force, and from

which future promotions will most likely be made. Restricting the convention to these proved performers is not inconsistent with the primary and dominant purpose plaintiff intends the convention to serve and in which plaintiff's highest officers play such a dominant role. If a company gave a picnic or dance for all of its employees, it surely would not be considered as giving them "wages" or "remuneration" upon which it would be required to effect withholdings. The expenditure would, obviously, be considered as falling within the *"Facilities or privileges"* subsection of the withholding tax regulation. Cf., Hallmark Cards, Inc. v. United States, 200 F.Supp. 847 (W.D.Mo.1961). And surely the result would be the same even if it decided to restrict the picnic or party to a group of its best employees who met some production quota or other qualification.

Providing some free time at the convention for pleasurable pursuits, as well as a social event or two, is also of no important consequence. Such features of most business meetings, conferences, or conventions have not served to destroy their essential business aspects for tax purposes. It is the "dominant motive and purpose" of the convention and the trip (Rudolph v. United States, 370 U.S. 269, 270, 82 S.Ct. 1277, 8 L.Ed. 2d 484 (1962)) and whether it is "related primarily to business" (id., at 277, 82 S.Ct. 1277) that is determinative.

Treas.Reg. (26 C.F.R., Part 1) § 1.162–2 (b) (1); [5] Rev.Rul. 60–16, 1960–1 Cum. Bull. 58 (making the rule is applicable to employed persons as to self-employed). From plaintiff's point of view, paying for one sightseeing tour and a dance, would not, in the total setting, do violence to the basic overall business purpose of the convention. A certain amount of conviviality may well do its share in bolstering employee morale and producing a healthy feeling of identity with the company, which the *"Facilities or privileges"* portion of the regulation recognizes.

Nor is the enthusiastic literary style which plaintiff used in terming the convention a "holiday" or "vacation" of important significance. These are loose terms that may well mean different things to different people, and depending upon the particular setting. In directing attention to the "free" time aspects, plaintiff was understandably attempting to make the convention seem as attractive as possible. It is the business reality of the total situation, not the colorful expressions of the publicity department in selectively emphasizing only certain aspects, that is controlling.

The conclusion is the same insofar as the wives' expenses are concerned. While the attempt to cast, for tax purposes, a "business" coloration upon a wife's traveling expenses is, naturally, generally frowned upon,[6] nevertheless,

5. "If a taxpayer travels to a destination and while at such destination engages in both business and personal activities, traveling expenses to and from such destination are deductible only if the trip is related primarily to the taxpayer's trade or business. If the trip is primarily personal in nature, the traveling expenses to and from the destination are not deductible even though the taxpayer engages in business activities while at such destination."

6. In connection with the allowance of trade or business expenses as a deduction, Treas.Reg. (26 C.F.R., Part 1) § 1.162–2 (c) provides: "Where a taxpayer's wife accompanies him on a business trip, expenses attributable to her travel are not deductible unless it can be adequately shown that the wife's presence on the trip

has a bona fide business purpose. The wife's performance of some incidental service does not cause her expenses to qualify as deductible business expenses. * * *." In such cases, a wife's traveling expenses have been held to constitute nondeductible personal expenses in some instances (see e. g., Sheldon v. Commissioner of Internal Revenue, 299 F.2d 48 (7th Cir. 1952); Silverman v. Commissioner of Internal Revenue, 253 F.2d 849 (8th Cir. 1958)) and deductible expenses of a business nature in others (Walkup Drayage & Warehouse Co., 4 TCM 695, 703 (1945); Warwick v. United States, 236 F.Supp. 761 (E.D.Va. 1964)), depending upon the particular facts in the individual case. It would appear to be quite true, however, that more cases could be cited denying deductions than permitting them.

considering the particular facts herein involved, plaintiff has more than met its burden of justifying, from its own wholly business point of view as the employer of the wife's husband, the expense of bringing the wives to the convention. The record amply demonstrates the importance plaintiff attaches to the role of the wife in the overall success of the agent's performance. She is the object of special attention and investigation even predating the hiring of the agent. And after the agent is employed, training and educational materials are specifically directed to her. Parts of the conventions herein involved were specially pointed to her. The wives actively participated in the business of the convention. They delivered prepared addresses. If the husband qualifies, they too are "expected" not only to attend, but to be present at the meetings and the other planned activities. Their attendance at the headquarters room is encouraged.

Of course, one may blandly affirm that all wives, not only those of life insurance salesmen, may well contribute importantly to their husbands' business successes or failures. But this oversimplified generalization fails to comprehend the realities at least of plaintiff's own special business operation. It is quite true, as defendant points out, that technically the wife is neither the employee of the company nor of the husband. But the special effort that at least this plaintiff makes to train and educate the wife, to integrate her into the agent's operations, and to obtain the benefits of her contributions, both intangible and tangible, all in the hope of substantial corporate advantage to itself, cannot be disregarded. Cf. Warwick v. United States, 236 F.Supp. 761 (E.D.Va.1964).[7] While some may honestly differ as to the wisdom of incurring such an expense—although there is no evidence that experts and consultants in plaintiff's industry do so differ on this point—plaintiff's good faith judgment, based on its own expertise developed from years of experience, must necessarily be afforded at least some respect. After all, it is plaintiff who is vested with the responsibility of running its business, not others, and its bona fide judgment in this respect, especially when it is an entirely credible one, should be accorded due recognition. Indeed, it is difficult to reject it when the record contains nothing at all of a contrary nature upon which to base such a rejection.[8] Cf. Gordy Tire Co. v. United States, 296 F.2d 476, 479, 155 Ct.Cl. 759, 764 (1961).

Defendant relies heavily upon two cases in which the courts held that an insurance salesman who sold the requisite amount of insurance and thereby obtained an all-expense trip for himself and his wife to a convention sponsored by the employer company was required to include the value of the trip as income and, further, that the cost of the trip could not be deducted as an ordinary and necessary business expense. Patterson v. Thomas, 289 F.2d 108 (5th Cir. 1961), cert. denied, 368 U.S. 837, 82

---

7. In this case, after noting that "the cases largely turn on factual situations" (at 766), and upon a detailed consideration of the facts therein involved, the court concluded "that the purpose of Mrs. Warwick's trips was not merely for her pleasure or vacation. * * * The only reason she went was because of her husband's business. Her trip was directly attributable to her husband's business, and it was appropriate to the conduct of his business. It assisted him in his business and assisted in the production of his income." (at 767.)

8. The wife of one of the employees who was an agent in 1958 and 1959, and who attended both conventions as a result of her husband's qualifying, testified:

"When I first heard of the convention, as such, my husband went. This is before these conventions. He went alone. I was not allowed to go, and I felt like he was really going on a holiday, and I was real hurt. But when the company evidently [sic] felt it was necessary to give the wives this education in insurance, as well as the husbands, I felt that—after I got there, I realized that it wasn't as much of a holiday as it had been played up to be. It is more business sometimes than even I would like." (Tr., p. 260).

S.Ct. 35, 7 L.Ed.2d 38; Rudolph v. United States, 189 F.Supp. 2 (N.D.Tex. 1960), aff'd 291 F.2d 841 (5th Cir. 1961), cert. granted, 368 U.S. 913, 82 S.Ct. 195, 7 L.Ed.2d 130 (1961), writ dismissed as improvidently granted, 370 U.S. 269, 82 S.Ct. 1277, 8 L.Ed.2d 484 (1962).

However, these cases are, for two reasons, not controlling:

First, what was there involved was, in proceedings directly involving the employees themselves, the different question of the proper interpretation of other Code sections defining "gross income" as well as "ordinary and necessary" business deductions.[9] They were not concerned with the different problem of what, in a proceeding involving only the employer, constitutes "wages" or "remuneration" within the meaning of the withholding tax provisions. There is no necessary correlation between what constitutes "wages" or "remuneration" paid by an employer within the meaning of the employment or withholding tax sections, and what constitutes "income" to the employee within the meaning of the "gross income" sections. For instance, it was held in Rev.Rul. 190, 1953–2 Cum. Bull. 303, that certain transportation allowances paid by an employer to his employees under certain circumstances[10] did not constitute "wages" for employment or income tax withholding purposes since "From the employer's point of view," such allowances "represent payments made for business purposes directly connected with the conduct of the employer's business," although "From the point of view of the employee * * * all such transportation allowances are,

of course, includible in his gross income" (at 305), the ruling further permitting the employee, however, to deduct, in computing his "adjusted gross income," his actual expenses incurred for such transportation up to the extent of his reimbursement therefor. And in Rev.Rul. 59–371, 1959–2 Cum.Bull. 236, it was also held (in a ruling of prospective application), that, with respect to reasonable amounts paid to certain employees as daily transportation and per diem allowances while working on remote construction projects for temporary periods, no withholding would be required where the employer, "in good faith, considers the employee's assignment to the particular project to be temporary in nature" (at 237), the ruling fixing the limit of 1 year's employment as being the test of a "temporary period" for the purpose in question. Under the ruling, such payments for less than 1 year would be treated "as reimbursements of expenses incurred by the employees in the business of the employer and not as additional wages" (at 236). The ruling goes on to make plain, however, that such treatment of these under 1-year payments would be *solely for purposes of witholding income tax under section 3402 of the Internal Revenue Code of 1954"* (id.), and that "Whether or not an employer withholds income tax from such allowances is not determinative of the question whether the expenses to which the allowances are related do or do not constitute deductible expenses of the employee under section 162(a) of the Code," which would depend on the showing made by "each individual employee"[11] (at 238). To the same effect is the holding in Rev.Rul. 56–249, 1956–1

9. 26 U.S.C. § 61, broadly defining "gross income"; § 62 defining "adjusted gross income," including subsection (2), defining "trade and business deductions of employees"; and § 162, providing that there shall be allowed as "a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business."

10. E. g., allowances received from the employer for actual expenses incurred by employee construction workers for daily

transportation between their regular place of employment and a distant construction project where they were temporarily employed.

11. Not only did the ruling make plain that the definition of "wages" it was making concerned itself only with the withholding of income tax provisions of section 3402, and not for the purpose of defining what constitutes income or deductible expenses under other Code provisions, but it went on to hold that it

Cum.Bull. 488 (unemployment benefits paid by a company under a trust established to supplement a state unemployment system do not constitute "wages" for purposes of income tax withholding provisions although they are includible in the "gross income" of the recipients).

Thus there is no need here to decide the different question that was involved in the *Rudolph* and *Patterson* cases.

It should be noted in this connection that defendant does not dispute the propriety of plaintiff's deducting, in the computation of its own income tax, the convention costs as ordinary and necessary expenses in the conduct of its business. As "wages," the expenses would, of course, also be deductible.[12] What it merely seeks to do is to shift the convention costs from the "Agency Conferences" expense category on plaintiff's books to the "wages" category, for the sole purpose, obviously, of imposing a withholding tax liability with respect thereto and a corresponding income tax liability on the employees. Thus, there is no direct question here involved of the proper amount of plaintiff's own income tax liability. The basic purposes of the withholding of income taxes at the source on wages, first adopted by the Current Tax Payment Act of 1943, appear to have been the establishment of a system of placing individual taxpayers on a pay-as-you-go basis, thus alleviating the burden of making large payments at one time, as well as "to guard the Treasury against deaths, disappearances, and insolvencies, and to catch the

itinerants who were moving from place to place with incomes taxable in the aggregate but with whom the Treasury could not keep pace," 8A Mertens, Law of Federal Income Taxation, § 47A.01, rather than as a device, as defendant is here using it, to determine the basic tax liability of the employee, who is not even a party to the case.[13]

Second, insofar as there can be considered to be overlapping considerations or a relationship between the question of what constitutes "wages or remuneration" under the withholding tax provisions (§ 3402 of the Code) and what constitutes "gross income" or "adjusted gross income" (§§ 61, 62, and 74), or what is deductible as ordinary and necessary business expenses (§ 162), there are significant factual differences between the Patterson v. Thomas and Rudolph v. United States cases and the instant case. In *Rudolph,* as found by the District Court, the life insurance company there involved transported the agents and their wives all the way from Dallas, Texas, where the company's home office was located, to New York City. Five to six days were involved in the overall convention trip, of which time only one morning session was devoted to a business meeting (followed by a business luncheon). "The remaining time" noted the court "was devoted to travel, sightseeing, entertainment, fellowship or free time." (189 F.Supp., at 3.) In concluding that the primary purpose of the trip "was a reward, or a bonus given to the em-

---

even was "not intended for use in determining an employee's 'wages' subject to the taxes imposed by the Federal Insurance Contributions Act and the Federal Unemployment Tax Act * * *." (at 238.)

12. In the *Patterson* case, the Circuit Court specifically noted that, with respect to deductibility, "the nature of the trip must be determined from the individual taxpayer's point of view, rather than from the viewpoint of his employer," that even admittedly all expense "vacations" paid for by the employer might well be deductible by the employer as a legitimate business expense, but that this would be

immaterial in deciding the question of the deductibility of the vacation expenditures by the employee "as an ordinary or necessary business expense" (289 F.2d, at 112–113).

13. By the time the assessments against plaintiff were made for the alleged withholding tax liabilities here involved, the passage of time had prevented defendant from making any assessments against the employees with respect to the 1958 tax year. None of the employees or their wives had included in their taxable income for 1958 any amount with respect to their attendance at the convention.

ployees for excellence in service" and that it was not "for the purpose of training and instructing them" (at 4), the court stressed the unusual distance of New York City from the company's home office and the paucity of planned business activity. As a result, it concluded that "the trip was primarily a pleasure trip in the nature of a vacation ·· * *·" (at 5). In the instant case, however, for one of the tax years involved, the convention was in fact held in Washington, the site of the company's home office (and where the majority of plaintiff's conventions have been held). And for the other tax year, the holding of the convention in New York City—generally reachable from the district offices in around half a day—also presents an entirely different picture.[14] Further, by comparison, the amount of planned activity of a business nature was obviously far greater in the instant case than the "one morning session" and the one "business luncheon" referred to in *Rudolph*.

And in Patterson v. Thomas, supra, the court, in concluding "the primary purpose of the trip *¡ * * was pleasure," not only stressed the fact that the convention was held at a resort hotel (at Old Point Comfort, Fort Monroe, Virginia, to which the employee and his wife spent two nights traveling en route from the company's home office in Birmingham, Alabama) but that "at the most, five hours out of the three and one-half days were spent in only two formal business meetings." The company's official in charge of making the arrangements for the convention had written to

the hotel manager that: "While we hold two business meetings during our four-day convention, business is secondary. The main object is to give our people a good time. Specifically, I would be interested in knowing the fishing accommodations" (289 F.2d, at 114). There was no showing, for instance, that there was anything like a "Headquarters Room" designed to entice the employees away from even the considerably lesser amount of "free time" that, as compared to the situation in *Patterson*, plaintiff granted.

On the facts, plaintiff's situation presents a far clearer "business" picture than was the situation in either *Rudolph* or *Patterson*. In cases of this kind, the determination of the basic nature and purpose of the "convention" depends upon the particular facts and circumstances of the individual case. Rudolph v. United States, 370 U.S. 269, 82 S.Ct. 1277 (1962).[15]

Defendant also relies heavily on Campbell Sash Works, Inc. et al. v. United States, 217 F.Supp. 74 (N.D.Ohio, 1963). These were six consolidated suits, two by related employer Ohio corporations and four by their employees, to determine in one proceeding certain tax consequences of 1-week employee January trips to Miami Beach, Florida, all of the expenses of which (including all flights and other transportation costs, hotel bills, meals and sightseeing) were defrayed by the corporations. All employees employed for more than 3 months were eligible. The plants were closed for production while the employees were away. The companies' officers decided

14. Defendant points out that plaintiff held one convention in the past on a cruise ship to Bermuda. However, that tax year is not here before the court. It is noted that that kind of a "convention" was never repeated by plaintiff.

15. Treas.Reg. (26 C.F.R., Part. 1) § 1.162–2(b) (2) provides: "Whether a trip is related primarily to the taxpayer's trade or business or is primarily personal in nature depends on the facts and circumstances in each case. The amount of time during the period of the trip

which is spent on personal activity compared to the amount of time spent on activities directly relating to the taxpayer's trade or business is an important factor in determining whether the trip is primarily personal. If, for example, a taxpayer spends one week while at a destination on activities which are directly related to his trade or business and subsequently spends an additional five weeks for vacation or other personal activities, the trip will be considered primarily personal in nature in the absence of a clear showing to the contrary."

that the long work hours by the employees in the immediately preceding peak-production period were causing a high number of product rejects and much absenteeism, and that, since January was the companies' slowest business period, the companies would "send their employees to Florida for a rest and relaxation" (at 77). The companies anticipated that such a trip would serve to increase the employees' efficiency. However, the employee could take the trip or not, as he wished. No business was transacted during the trips. The court held that generally "The primary purpose of the corporations' employees' trip to Florida was to take a pleasure trip in the nature of a vacation" (at 78). Consequently, it concluded that the fair market value of the trips represented "wages" for employment and withholding tax purposes insofar as the employer corporations were concerned; that as to three of the employees (who did take the group Florida trip) such value constituted additional income; that two of such three were not entitled to corresponding deductions for the cost of the trips (being primarily pleasure trips as to them); but that one employee, "in view of the activities" in which he engaged in connection with the trips (he was assigned certain duties, including at-

16. The fourth employee appeared to be in a different category. One year he did not go to Florida with the group, but went later. In the second year, he went to Maryland instead. Unlike the others, he received certain cash "vacation allowances." The court concluded that these "allowances" too constituted additional income to him, but no discussion or holding appears concerning the question of permissible deductions against such income.

17. Plaintiff also makes an additional contention. It says that, as to the 1958 tax year, the record shows (finding 42) that the employees involved all filed their returns and paid their taxes shown thereon to be due, and that the statute of limitations for any further assessment against the employees has expired. It therefore contends that even had withholding by plaintiff been required, it would make no difference because, under section 3402(d) of the 1954 Code, the employee must be

tending to the needs and welfare of the employees), was "entitled to a deduction for the cost of these trips" (at 78).[16] (Here too there evidently was no question raised about the deductibility by the employer corporations on their income tax returns of the cost of the trips.)

These *Campbell* cases are obviously different. There could hardly be any serious question concerning the "vacation" nature of the 1-week all-expense Florida trips involved. Indeed, this was in effect conceded. The basic question instead appeared to be the propriety, considering alleged duties performed on the trips by the employees involved, of their deducting the cost of the trips from their value includible in income. Only one was permitted to do so.

Based on all of the facts and considerations hereinabove set forth, it is concluded that the convention expenses herein involved did not constitute "wages" or "remuneration" within the meaning of the withholding tax provisions of section 3401, and that they are, instead, to be considered as following within the provisions of section 31.3401(a)–1(b) (2), *"Traveling and other expenses,"* and subsection 1(b) 10, *"Facilities or privileges,"* of the regulations issued under such section.[17] Accordingly, plaintiff

considered as having paid the tax, thus relieving plaintiff from any liability. Section 3402(d) reads:

"If the employer, in violation of the provisions of this chapter, fails to deduct and withhold the tax under this chapter, and thereafter the tax against which such tax may be credited is paid, the tax so required to be deducted and withheld shall not be collected from the employer; but this subsection shall in no case relieve the employer from liability for any penalties or additions to the tax otherwise applicable in respect of such failure to deduct and withhold."

Defendant argues, however, that the record also makes plain (finding 42) that the employees did not include in their income any amounts relative to their attendance at the convention and that therefore, under its interpretation, section 3402 (d) is inapplicable.

In view of the disposition made of the case, it is not necessary to determine this question.

should be held entitled to recover $6,-493.96, plus the interest paid thereon, for 1958, and $6,288.76, plus the interest paid thereon, for 1959, together with interest on the above amounts as provided by law.