**HUMBLE PIPE LINE COMPANY**

v.

**The UNITED STATES.**

**No. 343–68.**

United States Court of Claims.

May 14, 1971.

Davis, J., dissented in part and filed opinion.

David W. Richmond, Washington, D. C., attorney of record, for plaintiff; Miller & Chevalier, Walter V. Morgan, V. Val Dent, and Robert L. Moore II, Washington, D. C., of counsel.

Frances M. Foltz, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant; Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

OPINION

PER CURIAM:

This case was referred to Trial Commissioner Mastin G. White with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on August 17, 1970. On September 18, 1970, the court granted a joint motion to consolidate this case and No. 392–67 (Humble Oil & Refining Company v. United States, Ct.Cl., 442 F.2d 1362, a case in which Trial Commissioner Lloyd Fletcher had filed an opinion and report on June 5, 1970) for further proceedings. On October 17, 1970, defendant filed a supplemental brief on consolidation and exceptions to the commissioners' reports. The cases have been submitted to the court on oral argument of counsel and the briefs of the parties.

Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as

the basis for its judgment in this case *. (See also the opinion of this date in the consolidated and companion case, No. 392–67, referred to above.) Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 131(c) in accordance with this opinion.

## OPINION OF COMMISSIONER

WHITE, Commissioner: This is an action to recover the amount of a tax deficiency, plus interest, which the Internal Revenue Service assessed against, and collected from, the plaintiff for the year 1961. The assessment of the deficiency was based upon a determination by the IRS that the plaintiff should have withheld taxes on a total of $278,233.34 which the plaintiff paid out during 1961 in order to defray certain moving expenses of employees who were transferred by the plaintiff from Shreveport, Louisiana, to Houston, Texas.

The Internal Revenue Service, in assessing the deficiency mentioned in the preceding paragraph, purported to act under the authority of Sections 3402 and 3403 of the Internal Revenue Code of 1954 (26 U.S.C. §§ 3402, 3403 (1958)). Section 3402 provided in 1961 that every employer "making payment of wages" should deduct and withhold "upon such wages" a tax computed at the rate of 18 percent (after taking an employee's exemptions into account). Section 3403 declared that "The employer shall be liable for the payment of the tax required to be deducted and withheld * * *."

Therefore, the basic question to be decided in this case is whether the $278,-233.34 which the plaintiff expended during 1961 in defraying certain moving expenses of its employees constituted "wages," within the meaning of that term as used in Section 3402 of the 1954 Code, so as to impose on the plaintiff the statutory duty to withhold taxes "upon such wages" at the prescribed rate

of 18 percent, or become liable for its failure to do so.

It is my opinion that this question should be answered in the negative; that the Internal Revenue Service acted erroneously in holding that the expenditures involved here were "wages"; and, accordingly, that the plaintiff is entitled to recover in the present action.

The plaintiff is a Delaware corporation and a wholly owned subsidiary of Humble Oil & Refining Company. The principal business of the plaintiff is the common carrier transportation of crude petroleum and its products by pipeline.

Prior to 1961, the plaintiff maintained its headquarters office in Shreveport, Louisiana. Approximately 200 persons were employed by the plaintiff in the Shreveport headquarters office. As a result of a corporate reorganization, the plaintiff decided to move its main office in 1961 from Shreveport to Houston, Texas, and thereafter to retain in Shreveport an area office employing approximately 10 people. Except for the 10 employees who were to remain in Shreveport for the purpose of staffing the plaintiff's area office there, the plaintiff wanted to move the entire headquarters personnel from Shreveport to Houston, along with the work, so that the plaintiff would have experienced people in Houston to carry on its operations there after the transfer of the headquarters office to Houston.

In connection with the planning for the transfer of its headquarters office from Shreveport to Houston, the plaintiff sought information from other companies in Shreveport, and also from its parent corporation, Humble Oil & Refining Company in Houston, as to what their respective practices were with respect to paying the moving expenses of employees whom they asked to move from one location to another. The plaintiff learned that there existed among the companies surveyed a general pattern pursuant to which such compa-

---

* The opinion of DAVIS, Judge, dissenting in part and concurring in part, follows the opinion of Trial Commissioner White which has been adopted by the court.

nies defrayed what they considered to be the ordinary moving expenses of any employee who moved from one location to another at the request of the employing company.

After making the survey referred to in the preceding paragraph, the plaintiff prepared and distributed among its personnel in Shreveport a document that set out the policy which the plaintiff would follow in defraying the moving expenses of employees who moved from Shreveport to Houston at the request of the plaintiff. In this policy statement, the plaintiff declared that it would defray moving expenses falling within the following categories:

(a) expenses incurred by employees in transporting themselves, their immediate families, their household goods, and their personal effects to Houston;

(b) expenses incurred by employees in connection with the sale of residences owned by them in Shreveport (such expenses to include costs involved in preparing residences for sale, advertising costs, brokers' commissions, deed costs, mortgage prepayment penalties, and closing costs);

(c) an amount equal to 75 percent of the "loss" sustained by any employee who sold his home in Shreveport for a price less than its appraised value (provided the employee placed his house for sale on multiple listing, or with two or more brokers, and then was unable to sell the house for as much as its appraised value);

(d) expenses incurred by employees in connection with the purchase of residences in Houston (such expenses to include the cost of house-hunting trips to Houston, interest for 6 months on down-payment loans, costs involved in obtaining credit reports, survey costs, costs involved in obtaining mortgages, title insurance costs, escrow fees, closing costs, and recording fees); and

(e) other miscellaneous expenses of a reasonable nature (such as, for example, living expenses in a Houston hotel or motel for a maximum period of 30 days while awaiting the availability of an apartment or house in Houston).

As stated earlier in this opinion, there were approximately 200 persons employed in the Shreveport headquarters office of the plaintiff at the time when it was decided to transfer the headquarters office from Shreveport to Houston. Except for approximately 10 employees who were to remain in Shreveport for the purpose of staffing an area office which the plaintiff expected to maintain there, all the persons employed in the Shreveport headquarters office were asked by the plaintiff to move to Houston, along with the work. Approximately 130 employees did move to Houston at the plaintiff's request. However, approximately 60 employees declined to leave Shreveport, and quit the plaintiff's employment rather than move to Houston. Of the 60 (approximately) employees in the group last mentioned, about half of them were married women whose husbands worked in Shreveport, and the other half were employees who were in their 60's and who elected to take early retirement rather than move from Shreveport.

In moving approximately 130 employees and their families from Shreveport to Houston, the plaintiff defrayed moving costs that totaled $406,495.65. Of this total, the sum of $128,262.31 represented category (a) costs, as previously described in this opinion (i. e., the so-called "direct" costs involved in transporting the employees, their immediate families, their household goods, and their personal effects to Houston). The moving expenses in categories (b), (c), (d), and (e) aggregated $278,233.-34.

The tax deficiency involved in the present case was assessed against the plaintiff by the Internal Revenue Service with respect to the outlay of $278,-233.34—and not with respect to the outlay of $128,262.31—mentioned in the preceding paragraph. Thus, only the so-called "indirect" costs involved in moving the plaintiff's employees from Shreveport to Houston (i. e., expenses

incurred by employees in connection with the sale of their Shreveport residences, 75 percent of the "losses" sustained by employees in selling Shreveport residences at less than the appraised valuations, expenses incurred by employees in connection with the purchase of residences in Houston, and other expenses of a miscellaneous nature incurred by employees in connection with the move to Houston) are before the court for consideration in the present litigation. The problem is to determine whether the plaintiff was required by Section 3402 of the Internal Revenue Code of 1954 to withhold taxes upon the amounts which it paid out in defraying such "indirect" costs.

It should be made clear that the court does not have before it in this case the question of whether the plaintiff's actions in defraying the "indirect" moving costs of its employees conferred an economic benefit upon the employees, so as to make it necessary for the individual employees to report as income the respective amounts which the plaintiff expended on their "indirect" moving costs. *Cf.* Ritter v. United States, 393 F.2d 823, 829–830, 183 Ct.Cl. 875, 885 (1968), *cert. denied,* 393 U.S. 844, 89 S.Ct. 127, 21 L.Ed.2d 115 (1968). Rather, the question now before the court is whether the plaintiff, in defraying the "indirect" moving costs of its employees, was paying wages to such employees. The plaintiff, as an employer, was required by Section 3402 of the 1954 Code to withhold taxes only upon amounts paid out as wages.

The term "wages" has a much narrower meaning than the term "income," because wages are merely one form of income. The term "wages" was defined by statute in 1961 to mean "all *remuneration * * * for services performed* by an employee for his employer, including the cash value of all remuneration paid in any medium other than cash * * * * " (26 U.S.C. § 3401(a) (1958); emphasis supplied).

It is my opinion that when the plaintiff defrayed the moving costs of its em-

ployees (irrespective of whether such costs were "direct" or "indirect"), the plaintiff was not remunerating or paying the employees for services performed.

In the first place, it was the plaintiff's policy to fix wages and salaries in relation to the value of the services performed by different employees, whereas the amount expended by the plaintiff on the moving costs of a particular employee was not based upon, and was unrelated to, the value of the services performed by the employee for the plaintiff. Such amount was determined wholly by other factors—*e. g.,* the size of the employee's family, whether the employee moved a large or a small amount of household goods from Shreveport to Houston, whether the employee received a good price or a poor price for his Shreveport home in relation to its appraised value, whether the employee's access to a satisfactory apartment or house in Houston was prompt or delayed, etc.

Furthermore, the transfer of employees from Shreveport to Houston was the result of a business decision by the plaintiff (or its parent corporation) that the corporate interests of the plaintiff would be served to better advantage by transferring its headquarters office from Shreveport to Houston. The employees who moved from Shreveport to Houston did so because the plaintiff, for its own business purposes, was transferring their jobs to Houston, and they went along at the plaintiff's request in order to continue doing the plaintiff's work. Thus, the amounts which the plaintiff expended in defraying the moving costs of its employees were, "from plaintiff's point of view as an employer, expenditures incurred to advance its own wholly legitimate and bona fide business purposes." Peoples Life Insurance Co. v. United States, 373 F.2d 924, 929, 179 Ct.Cl. 318, 327 (1967). It follows that, in paying out amounts to defray its employees' moving costs, the plaintiff was not compensating or other-

wise rewarding the employees for services rendered by them.

For the reasons previously stated, the Internal Revenue Service was not justified in assessing a deficiency, plus interest, against the plaintiff because of the latter's failure to withhold taxes on the $278,233.34 which the plaintiff expended in defraying the "indirect" moving costs of employees who moved from Shreveport to Houston in 1961 at the plaintiff's request. Accordingly, the plaintiff is entitled to recover in the present action.

Prior to the trial, the parties agreed, with the approval of the commissioner, that the trial would be limited to the issue of the defendant's liability, and that the amount of the plaintiff's recovery (if any) should be determined in subsequent proceedings under Rule 131(c).

DAVIS, Judge (dissenting in part and concurring in part):

On the major issue, I disagree for the reasons stated in my separate opinion in Humble Oil & Refining Co. v. United States, No. 392-67, Ct.Cl., 442 F.2d 1362. However, there is a secondary question, not reached or discussed in the court's opinion—whether taxpayer is liable for the portion ($9,014.76) of the total deficiency for 1961 ($59,096.76) representing additional taxes under §§ 3401-02 on the $50,082 which Humble should have withheld from its employees, but did not, on the $278,233.34 reimbursed as "indirect" moving expenses (see finding 3); the Service's theory is that the employer, by failing to withhold or to collect from the employees, necessarily assumed the latter's income tax and this assumption created additional "wages" to the employees. I concur that taxpayer is entitled to recover on this part of its claim. Apart from whether Humble's payment of the deficiency in 1964 constituted an assumption of the workers' tax liability for 1961, I do not think that Congress intended "wages" under §§ 3401-02 to reach so far as to include a withholding tax imposed upon and collected from the employer under § 3403

by the deficiency procedure. That sort of compulsory payment is not an "amount paid by an employer *on behalf of the employee* * * * on account of any payment required from an employee * * * on account of any tax imposed upon the employee by any taxing authority" (Treas.Reg. on Employment Tax (1954 Code), § 31.3401(a)–1(b) (6)) (emphasis added).

## FINDINGS OF FACT

1. (a) The plaintiff is a corporation organized and existing under the laws of the State of Delaware, and has its principal office at 800 Bell Avenue, Houston, Texas. The plaintiff's principal business is the common carrier transportation of crude petroleum and its products by pipeline. The plaintiff's name was changed from Interstate Oil Pipe Line Company to Humble Pipe Line Company on August 1, 1961.

(b) The plaintiff is a wholly owned subsidiary of Humble Oil & Refining Company.

2. The plaintiff timely filed for the calendar year 1961 its federal tax returns with respect to withholding taxes upon wages, and timely paid the tax liability shown thereon. Thereafter, the Commissioner of Internal Revenue assessed a deficiency against the plaintiff in the amount of $59,096.76 for 1961.

3. The Commissioner of Internal Revenue arrived at the $59,096.76 deficiency by determining that the plaintiff should have withheld taxes on $278,233.-34 which it paid in 1961 to or on behalf of its existing employees incident to their moving to a new place of employment. The Commissioner taxed these payments for moving expenses at the rate of 18 percent, which resulted in a deficiency of $50,082. The Commissioner also determined that the plaintiff should have withheld taxes on the $50,082 tax deficiency payment, and taxed this payment at the rate of 18 percent, which resulted in an additional deficiency of $9,014.76.

4. (a) On December 29, 1964, the plaintiff paid the $59,096.76 deficiency assessed for 1961, plus $10,785.16 (corrected on February 19, 1965, to $10,713.11) interest thereon.

(b) The plaintiff made no deduction in the amounts paid to any of its employees, and received no reimbursement from any of its employees, on account of the payment of the deficiency and interest thereon.

5. The plaintiff timely filed a claim for refund in the amount of $69,809.87 for 1961 and asserted therein that (1) the Commissioner of Internal Revenue had erroneously determined that certain moving expense payments made in 1961 by the plaintiff to or on behalf of its employees were "wages," as defined by Section 3401 of the Internal Revenue Code, and (2) the Commissioner of Internal Revenue had also erroneously determined that the plaintiff was required in 1961 to withhold taxes on such payments and was liable for a tax of $50,082 for failure to withhold taxes. The plaintiff also asserted in its claim for refund that the Commissioner of Internal Revenue had erroneously determined that the $50,082 tax deficiency assessed against and paid by the plaintiff constituted "wages," as defined by Section 3401 of the Internal Revenue Code, and had erroneously determined that the plaintiff was liable for $9,014.76 for failure to withhold taxes on such tax payment. Further, the plaintiff asserted in its claim for refund that the interest on the $9,014.76 deficiency was erroneously assessed and collected.

6. Prior to 1961, the plaintiff had its main office, at which it employed approximately 200 persons, in Shreveport, Louisiana. As a result of a corporate reorganization, the plaintiff decided to move its main office, in 1961, to Houston, Texas, and decided to retain an area office in Shreveport, at which it employed approximately 10 people. In order to meet its business requirements in its new Houston headquarters, the plaintiff needed the services of a majority of the employees who had been working in its old Shreveport headquarters. Consequently, the plaintiff, by personal interviews and group meetings, offered the employees it needed from the Shreveport office employment in Houston and informed them of the moves requested of them. Each employee who was asked to move to Houston had the alternative of moving and taking up work in Houston in approximately the same position with the company, or of not making the move and seeking employment with another company. (After it moved its headquarters to Houston, the plaintiff no longer employed those of its former employees who were not asked to move and were not retained in the Shreveport area office, or who were asked to move but decided not to move as requested.)

7. (a) In connection with the planning for the move of the plaintiff's headquarters office from Shreveport to Houston, the plaintiff sought information from other companies in Shreveport, and from the Humble Oil & Refining Company in Houston, as to what their respective practices were with respect to paying the moving expenses of employees who moved from one location to another at the request of the employing company.

(b) On the basis of the survey mentioned in paragraph (a) of this finding, the plaintiff learned that there existed among the companies surveyed a general pattern pursuant to which such companies defrayed what they considered to be the ordinary moving expenses of employees who moved from one location to another at the request of the employing company.

(c) Also, it had been the practice of the plaintiff, before 1961, to pay the moving expenses of its own employees when they were required to move from one place to another in connection with their work for the plaintiff.

8. The plaintiff offered to pay, or reimburse each employee for, various amounts incident to moving to Houston if the employee made the move in order to work for the plaintiff. The particular reimbursements and payments the

plaintiff offered to make, and the conditions under which they were to be made, were set forth in a document entitled "Interstate Oil Pipe Line Company Temporary Policy For Moving Shreveport Headquarters Employees To Houston" (usually referred to hereafter as "Moving Expense Policy"). The Moving Expense Policy applied to all employees whose employment was contingent upon their moving from Shreveport to Houston.

9. The plaintiff did not request any sort of commitment from an employee who was being transferred to Houston that he would continue working for the plaintiff for a period of time after the employee moved and received reimbursement for moving expenses under the Moving Expense Policy. The plaintiff felt that it was not necessary to require such a commitment. (In this connection, see findings 12 and 24).

10. (a) A major reason why the plaintiff adopted the Moving Expense Policy was that the transfer of its headquarters office from Shreveport to Houston had to be accomplished within a relatively short time and the plaintiff believed that it was necessary to transfer to Houston most of the personnel employed in the Shreveport headquarters office, so that the plaintiff would have experienced people in Houston to carry on its operations there after the transfer of the headquarters office to Houston. Thus, the plaintiff thought that the adoption of the Moving Expense Policy would facilitate the move of the headquarters office from Shreveport to Houston within a very short time and would enable the plaintiff to keep the work going on in Houston without undue interruption after the transfer of the headquarters office to that city.

(b) Another important reason for the adoption of the Moving Expense Policy was the belief on the part of the plaintiff that the morale of its employees who moved from Shreveport to Houston would be adversely affected if the plaintiff did not follow the general pattern established by other companies (see finding 7) with respect to paying the moving expenses of employees required to move from one place to another in order to keep their jobs.

11. There was no relationship between the Moving Expense Policy, on the one hand, and the plaintiff's policy of compensating employees on the basis of the value of their services, on the other hand. The extent of the moving expenses defrayed by the plaintiff for an employee in connection with the move from Shreveport to Houston depended wholly on the extent of the allowable costs incurred by the employee, and did not depend to any extent on the amount of the employee's salary (with a minor exception to the effect that the total reimbursement for miscellaneous expenses of the type referred to in finding 15(b) (5) could not exceed the employee's base pay for 1½ months).

12. (a) There were approximately 200 persons employed in the Shreveport headquarters office of the plaintiff at the time when it was decided in 1961 to move the headquarters office from Shreveport to Houston. Except for approximately 10 employees who were to remain in Shreveport for the purpose of staffing an area office which the plaintiff expected to maintain there, all the persons employed in the Shreveport headquarters office were asked by the plaintiff to move to Houston, along with the work.

(b) Approximately 130 of the employees actually did move from Shreveport to Houston in 1961 at the plaintiff's request.

(c) Approximately 60 employees who were asked by the plaintiff to move from Shreveport to Houston did not do so, and were no longer employed by the plaintiff after the headquarters office was transferred from Shreveport to Houston. About half of them were married women whose husbands worked in Shreveport and who were unwilling to leave their homes in Shreveport. The other half were employees who were in their 60's and who elected to take early

retirement rather than move from Shreveport to Houston.

13. Employees of the plaintiff moved from Shreveport to Houston because the plaintiff saw fit to move its headquarters office, and their jobs, to Houston and no longer had any jobs for the particular employees in Shreveport. The fact that the plaintiff paid moving expenses under the Moving Expense Policy was not an important factor in persuading the employees to move from Shreveport to Houston. However, even before the Moving Expense Policy was announced by the plaintiff, the employees who were moving to Houston expected that the plaintiff would pay their moving expenses, since the plaintiff had followed the practice, before 1961, of paying the moving expenses of any employee who was asked by the plaintiff to move from one place to another for the benefit of the plaintiff and its work. Some employees felt that the plaintiff had an obligation to pay their moving expenses.

14. The plaintiff's Moving Expense Policy enabled its employees to make their decisions to move from Shreveport to Houston without any worry over the major costs of the move.

15. (a) When the employees moved and took up work with the plaintiff in Houston, the plaintiff made the reimbursements and payments set out in the Moving Expense Policy, as it had agreed to do. (The moving expenses were sometimes paid directly by the plaintiff, and were sometimes paid by the employees, who were thereafter reimbursed by the plaintiff.) The payments which the plaintiff made to or on behalf of its employees were based solely upon the provisions of the Moving Expense Policy and were in no way related to the salary or position of the employees being moved (except that reimbursement for miscellaneous moving expenses—see subparagraph (5) of paragraph (b) of this finding—could not exceed an employee's base pay for 1½ months).

(b) The payments which the plaintiff made to or on behalf of its existing employees can be separated into the following categories:

(1) Expenses incurred by employees in moving themselves, their immediate families, and household goods and personal effects to Houston—$128,262.31;

(2) Expenses incurred by employees in the sale of their residences in Shreveport (brokers' commissions, expenditures in preparing residences for sale, costs of advertising, deed costs, mortgage prepayment penalties, closing costs and fees)—$68,463.04;

(3) Amounts paid to employees representing, in the case of each employee to whom payment was made, an amount equal to 75 percent of the excess of an appraised value of the employee's house in Shreveport over its actual selling price (provided that the employee placed his house for sale on multiple listing, or with two or more brokers, and then was unable to sell the house for as much as its appraised value)—$89,426.66;

(4) Expenses incurred by employees in purchasing new residences in Houston (house-hunting trips, interest on loans, expenditures for acquiring mortgages and securing title policies, recording fees, loan papers, credit reports, surveys, restrictions, escrow fees, closing costs and fees)—$29,145.00;

(5) Other expenses of a miscellaneous nature incurred by employees (interim living expenses, expenses of interim trips to Houston, and other miscellaneous expenses)—$91,198.64.

(c) The amount upon which the Commissioner of Internal Revenue assessed withholding tax was the $278,233.34 itemized in subparagraphs (2) through (5) of paragraph (b) of this finding. No withholding tax was assessed upon the amount set out in subparagraph (1) of paragraph (b).

16. With respect to the amounts paid to employees referred to in finding 15(b) (3), the appraised value was fixed by the plaintiff on the basis of two independent appraisals obtained by the plaintiff. The plaintiff maintained a list of independent professional apprais-

ers and from this list would select two appraisers. The appraisers would be requested to submit an appraisal on a form developed by the plaintiff and bill the plaintiff for the appraisal cost. If there was a wide difference between the first two appraisals, a third appraisal would be obtained. There was no specified time that an employee had to keep his house on the market before he could sell for a price that was less than the appraised value. However, each employee was advised that before he entered into such a contract for sale, he should get approval of the sale from his supervisor. In some cases where an employee received low offers, it was felt necessary to provide guidance to the employee. The plaintiff would not approve the sale and recommended changing real estate brokers, or pointed out that the appraisals were a fair indication of the market price and it was reasonable to wait until an offer at or close to the market price was received.

17. The plaintiff's expenditures incident to moving employees from Shreveport to Houston (see finding 15) were incurred because of moves that such employees made at the plaintiff's request and pursuant to the plaintiff's offer to pay, or reimburse employees for, moving expenses.

18. (a) Some of the moving expenses incurred by employees of the plaintiff in moving from Shreveport to Houston—such as the cost of moving household furnishings—were paid directly by the plaintiff.

(b) Other moving expenses—such as the cost of house-hunting trips from Shreveport to Houston prior to the move, the cost of temporary living quarters in a Houston hotel or motel after moving to Houston and before an apartment or house in Houston could be obtained for long-term occupancy, the cost of new drapes for, or of redecorating, the apartment or house obtained in Houston, and the cost of connecting household appliances after the move to Houston—were paid by the employees in

the first instance, and they were then reimbursed by the plaintiff under the "miscellaneous expenses" provision of the Moving Expense Policy.

(c) With respect to reimbursement for miscellaneous expenses, an employee would submit an expense form to his supervisor, who would approve it if he would consider it to be reasonable. In determining whether a particular miscellaneous expense was reasonable, the supervisor considered the personal circumstances of the individual employee, such as the size of his family and their special requirements.

19. The total cost to the plaintiff of moving one highly paid employee from Shreveport to Houston was $8,000.

20. The employees understood that the expenses of moving were their own personal expenses, in the first instance, and that the company was defraying expenses which they would have had to pay otherwise.

21. Approximately 103 employees sold houses in Shreveport because of the move to Houston. Only three or four of the houses were sold at a price in excess of the appraised value arrived at in accordance with the manner set out in the Moving Expense Policy. At the end of six months, only about 60 percent of the houses were sold. One house, which was located about 25 miles outside of Shreveport, was on the market for two years before it was sold. That house was appraised in accordance with the Moving Expense Policy at $7,000, and it was sold for $4,000. The owner was reimbursed for three-fourths of the difference, and also for other expenses involved in the sale of the Shreveport house, pursuant to the terms of the Moving Expense Policy. The same employee purchased a house in Houston and was reimbursed for certain expenses in connection with that purchase, pursuant to the Moving Expense Policy.

22. Regardless of the length of time it took to find a purchaser for a home

owned by an employee in Shreveport, there was never any reappraisal made of the property.

23. The plaintiff's employees who moved from Shreveport to Houston at the request of the plaintiff incurred some expenses incident to the move which were not covered by the Moving Expense Policy; and these amounts were not paid or reimbursed by the plaintiff. Examples of such things were the purchase of new furniture to complement the apartment or house occupied in Houston, the need to pay a higher rate of interest on a purchase-money mortgage in Houston than an employee had been paying in Shreveport, the higher cost of commuting and transportation incident to living in a larger city, the necessity for the payment of higher taxes in Houston, and in the case of employees who sold houses in Shreveport, 25 percent of the difference between the appraised value of an employee's house in Shreveport and the lower price at which the house was sold.

24. Approximately 6 of the plaintiff's employees who moved from Shreveport to Houston in 1961 at the request of the plaintiff quit the plaintiff's employment within a period of approximately six months after they moved to Houston.

25. The parties have agreed, with the approval of the commissioner, that the amount of the plaintiff's recovery, if any, shall be determined in subsequent proceedings pursuant to Rule 131(c).

## CONCLUSION OF LAW

Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, together with interest as provided by law, and judgment is entered to that effect. The amount of the recovery will be determined in subsequent proceedings under Rule 131(c).